# EXHIBIT 2

# Declaration of Anne Cooper

**MANNING CURTIS**
**BRADSHAW & BEDNAR PLLC**
Kathleen Weron (#8437)
Trevor Lee (#16703)
136 E. South Temple Street, Suite 1300
Salt Lake City, Utah 84111
Telephone: (801) 363-5678
Facsimile: (801) 364-5678
kweron@mc2b.com
tlee@mc2b.com

*Attorneys for Defendant Kane is Able*

---

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| AARON L. SAMPSON, <br><br> Plaintiff, <br><br> v. <br><br> KANE IS ABLE, INC, <br><br> Defendant. | **DECLARATION OF ANNE COOPER** <br><br> Case No.: 2:17-CV-00947-DN <br><br> Judge David Nuffer |

I, Anne Cooper, declare as follows:

1. From March 2016 through the end of Plaintiff's Aaron Sampson's ("Sampson") employment with Kane is Able, Inc. ("Kane"), I was the Senior Vice President of Human Resources at Kane. The facts set forth in this Declaration are based on my personal knowledge, client matter records kept in the ordinary course of business, or information and belief learned in the course of my employment. If called as a witness, I could and would testify competently to the facts stated therein.

1

2. On April 14, 2016, I received an email from Sampson requesting an investigation into an array of alleged instances of discrimination spanning the previous ten months.

3. Attached as Exhibit A is a true and correct copy of Sampson's April 14, 2016 email.

4. I, along with Alfonso Yslas ("Yslas"), Kane's Human Resources Manager, promptly conducted an investigation into all of Sampson's complaints and issued a report summarizing our findings.

5. Attached as Exhibit B is a true and correct copy of our notes from that investigation.

6. Attached as Exhibit C is a true and correct copy of the report summarizing our findings.

7. On May 6, 2016, I received an email from Sampson discussing an alleged meeting held by Floyd Kearl ("Kearl"), Operations Manager at Kane's Salt Lake facility.

8. Attached as Exhibit D is a true and correct copy of Sampson's May 6, 2016 email.

9. In May 2016, five weeks after returning from a work trip to Kane's Rialto, California location, Sampson brought to my attention various allegations that allegedly occurred on the Rialto trip.

10. Yslas and I promptly investigated Sampson's concerns.

11. After our investigation was complete, we issued a report summarizing our findings.

12. Attached as Exhibit E is a true and correct copy of our notes from that investigation.

13. Attached as Exhibit F is a true and correct copy of the report summarizing our findings.

14. Though I traveled to the Salt Lake facility the following month to review the findings of this investigation with Sampson in person, Sampson did not show up to work the day I was scheduled to meet with him, so I send him a memo summarizing our findings.

15. Attached as Exhibit G is a true and correct copy of the memo I sent to Sampson on July 29, 2016.

16. Throughout the month of June 2016, I received various emails from Sampson alleging discrimination and/or retaliation.

17. Attached as Exhibit H is a true and correct copy of an email I received from Sampson on June 10, 2016.

18. Attached as Exhibit I is a true and correct copy of an email I received from Sampson on June 11, 2016.

19. Attached as Exhibit J is a true and correct copy of an email I received from Sampson on June 22, 2016.

20. Attached as Exhibit K is a true and correct copy of an email I received from Sampson on June 29, 2016.

21. Attached as Exhibit L is a true and correct copy of a second email I received from Sampson on June 29, 2016.

22. That same month, one of Sampson's colleagues reported that Sampson went through her desk without her permission, and another colleague reported witnessing Sampson go through his supervisor's desk without permission.

23. Sampson was suspended with pay while Yslas and I investigated the allegations.

24. After investigating, we substantiated that Sampson had gone through the desks of a coworker and supervisor without permission.

25. I intended to review the findings of this investigation with Sampson when I flew to the Salt Lake facility in July 2016, but as discussed, Sampson did not show up to work that day, so I sent him an email with the investigation results, and also mailed them to him.

26. Additionally, I informed Sampson that he was being suspended for one week without pay, and that he should return to work the following week, on July 28, 2016 at 8:30 a.m.

3

27. I also informed Sampson that his lead designation was being removed, and that he would return to work as a lift truck operator.

28. Attached as Exhibit M is a true and correct copy of the email I sent Sampson on July 20, 2016.

29. Attached as Exhibit N is a true and correct copy of a memo summarizing our findings related to the desk allegations.

30. Sampson did not show up to work on his scheduled return date on July 28.

31. On July 29, I emailed Sampson reminding him that he was expected at work, and warned him that if he did not show up to work the following Monday, August 1, he would be considered to have voluntarily terminated.

32. Attached as Exhibit O is a true and correct copy of the memo I sent Sampson on July 29.

33. On August 1, Sampson did not show up for work. That day, I sent him a letter explaining that he had voluntarily terminated his employment with Kane.

34. Attached as Exhibit P is a true and correct copy of the letter I sent Sampson on August 1, 2016.

35. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

DATED this 9th day of November, 2018.

_____

Anne Cooper

# EXHIBIT A

## Aaron Sampson

| | |
|---|---|
| **From:** | Aaron Sampson |
| **Sent:** | Thursday, April 14, 2016 10:08 AM |
| **To:** | Mari Pena |
| **Cc:** | Anne Cooper |
| **Subject:** | Aaron Sampson - Opposition to Associate Counseling Report |
| **Attachments:** | 20160414100632984.pdf; 20160414100653249.pdf |

In February 2016, and several times prior, I voiced opposition to inappropriate behavior (to include Floyd Kearl) and double standards here at the Kane Salt Lake City warehouse.  Some of those issues included:

1. Floyd's failure to reprimand an associate for making racial comments to me
2. Floyd's fabrication of information from associates about me
3. Floyds inappropriate jokes in front of Safety Committee members
4. Floyd's failure to terminate employees for assaulting an associate on company property
5. Floyd's negative comments about Corporate personnel
6. Floyd subjecting me to double standards and harassment
7. Floyd failing to reprimand associates for violating corporate policy

On 3/28/16, Don Maxwell called me into a meeting in his office and informed me that he needed to discuss my Hourly EE Performance Review (attached).  Don discussed each area of the review and told me I was doing a "fantastic job".  Within two hours of this meeting I was called into a meeting with Don and Floyd in Floyd's office and told I was receiving a "verbal reprimand" for "poor performance on the job" and presented with an Associate Counseling Report (attached).  I feel the reasons outlined in the report are a double standard, harassment, discriminate, and unjustified, and is the result of my voicing opposition to the inappropriate behavior exhibited here at the Kane Salt Lake City warehouse.  I am preparing documentation to support my concerns and will present this information to you soon.  As a result of the treatment I am experiencing, I am requesting an immediate investigation by the H.R. Department into my concerns.  Your assistance would be greatly appreciated.

Sincerely,

Aaron L. Sampson

**Aaron L Sampson ♦ LTO Lead**
Nutrabolt, SLC ♦ Kane Is Able
1865 South 4490 West Salt Lake City Utah, 84104
*Dependable People. Exceptional Logistics*
801.973.6693



1

# EXHIBIT B

Investigation Draft

Claimant:      Aaron Sampson
Supervisor:    Don
Date of Hire:
Location:      Salt Lake City Terminal
Date / Time:   4.20.16 at 11:26 am

Interviewers:  Anne Cooper, J.D., SVP Human Resources
               Alfonso Yslas, Human Resources Manager

Parties interviewed:  Aaron Sampson, Claimant; Floyd, Don, Nie, Natalia
Aaron Sampson, Lead Lift Truck Operator and Safety Champion – African American Male
Floyd Kearl, Distribution Center Manager – Caucasian Male
Don Maxwell , Quality Manager – Caucasian Male
Nie Fotu, Forklift Operator  – Pacific Islander Male
Natalia Schonle, Inventory Control Clerk – Caucasian Female

Regarding the complaints, Aaron Sampson has provided a written detailed list of his complaints
and concerns as noted by numbers (1) – (8) below.  Where it was appropriate, we discussed
confidentiality of investigation and 'no retaliation' with the parties.

1. **Allegation: "Floyd's failure to reprimand an associate for making racial comments to
   me"**

**Anne and Alfonso:  We will ask you to please describe the incident with the time and date of
the situation.**

Aaron responds that the situation occurred in October or November of 2015. Aaron states that
he was speaking to Kevin Mayfield and Kevin stated "I can't understand anything you African
Americans say." Aaron says that Kevin was referring to Tony as well. Aaron states that he
brought these comments to Floyd's attention on the same day. Floyd did not respond
according to Aaron.

Further, Aaron states that in late November or within 3-4 weeks: that he was in the cafeteria
and Kevin Mayfield referred to Aaron as "Boy". Aaron addressed Kevin directly and said that it
was inappropriate. Aaron said that he told Floyd and Floyd didn't do anything about it. Aaron
said he reported it the same day. Aaron said that he was bothered that Floyd didn't see that it
was a situation.

KANE000476

**Anne and Alfonso** ask Floyd about Aaron's complaint regarding Kevin Mayfield's comment to Aaron about not understanding African Americans.

Floyd states that he knows nothing about this comment. Floyd appears shocked. Floyd reiterates that he was not aware of this comment by Kevin and states he would have most certainly addressed it.

Floyd goes on to state that there was an incident in which Kevin Mayfield came to Floyd's office and claimed that Aaron had just threatened his wife. Kevin complained that Aaron made the comment, "you know why he is no longer here? It's because of me".

Floyd said he spoke with Don first and asked if there were any issues with the Mayfields and Aaron. This was the first time there was an issue between them. Floyd states that he called Aaron in to find out what happened and that's when Aaron said Kevin Mayfield called him "Boy". Floyd said that Kevin was a jokester.

Floyd said he asked Kevin about the comment. Kevin said he used the comment with younger people and did not mean it in a derogatory way. Floyd advised that Kevin understood that Aaron took it in the wrong way because Aaron came back with the threat.

Floyd reports that a few weeks later, there was a mis-pick by Shannon on the floor; Aaron got a hold of her. Diane said that Shannon (note: Shannon is Kevin Mayfield's wife) was in the bathroom crying and upset about Aaron's comments. Aarons kept saying "how could you do this...how could you? Once Shannon calmed down, she explained the situation with Aaron.

Floyd stated that he completed a write-up documenting the situation dated Nov. 11, 2015. (See document). I did not talk to Aaron about the situation. I used another approach and brought him in a week later and said that hey, we are having some concerns from other Associates.

Floyd goes on to state that Tony Osei complained that had a problem with Aaron. Tony objected to how Aaron was talking to him about mis picks. This came out in Tony's exit interview. Floyd states that Tony Osei is an African American male. Some of the other Associates complaining about Aaron's treatment were Westin, John, Shannon – all temporary employees. Diane, Natalia, Nie and Steve have had issues with Aaron. Andrew avoids Aaron at all costs. Aaron gets really confused with more than one process. Cameron (recently left) had issues with Aaron. Floyd coached Cameron to say Aaron, "hey, I've got it." Floyd coached Aaron on micro managing.

Floyd states that Aaron requested Floyd to get everyone together to address the complaints against him. The Mayfield's spoke up, but no one else spoke up, talking to Aaron. Floyd said that the feedback was that we like you, but we don't like your approach. Aaron apologized to the group. Shannon was let go for her attendance first and then her husband Kevin was later let go.

KANE000477

Floyd further states that he felt the meeting was not going to be productive but Aaron insisted on having the meeting. Floyd states that this was similar to the comment by Tony Osei and that Aaron wanted to call him on the carpet. Floyd told Aaron that it was not the best way to address the issue. Aaron insisted on having the meeting. Floyd states that Aaron prefers to call a group meeting to get issues out on the floor.

Anne and Alfonso coach Floyd stating that it is not a good way to address conflict among the team. Floyd states that he knew this but Aaron insisted on having the meeting. Anne and Alfonso reiterate that this is not an acceptable way to handle conflict and that HR should have been called to assist.

Aaron states that Kevin was terminated due to a cycle count / miss-pick. Aaron states that Floyd and Natalia said he was terminated for this reason, not the inappropriate comments. Aaron thinks that Kevin was terminated the end of December 2015.

Floyd's response: Kevin Mayfield was terminated for attendance and tardys or 12 points in three months.

Aaron states that he addressed his concerns with Floyd the same week that he received the write up on the 29th or 30th of March. Aaron states that Floyd did say Kevin was terminated as a result of Kevin's comments. Aaron states that Kevin was with Pro Logistics temporary service.

Floyd states that the Mayfield's came up in the conversation on the write-up on the 29th(?) because Floyd talked about the situation with Shannon and Aaron's approach to handling the mis-pick.

(Investigators note that there is contradiction on when Aaron addressed his concerns with Floyd and whether he thought Kevin Mayfield was terminated as a result of his comments.)

Aaron states that Floyd is demeaning and belittling to him.

Floyd states that this is not true. Floyd discusses coaching and working with Aaron to help him advance in his career.

### 2. Allegation: "Floyd's fabrication of information from associates about me"

Please describe the incident: Time / Date / Situation – June 2015 or July 2015

Aaron states that this occurs 'like every other month if not every month." Aaron states that "we have two employees Nie, and Steve Jones that have fabricated lies about me. Nie said I don't need anything from you. This is when I first started the Lead LTO position. I told Floyd about and Floyd said it was inappropriate. Aaron states that he is explaining procedures: Nie took it upon himself to sign off on the MHE log. Aaron states, "I asked the guys who did this, you can't put zero's there." Aaron states that he brought it to Floyd's attention. Aaron states

that Floyd said, "you guys need to build your relationship." Aaron states that he and Nie went to lunch. About a couple of weeks, "Floyd approaches me out on the floor, Aaron, we are getting lots of complaints about the employees from you. Employees are afraid of you, Nie and Steve also said this." Aaron said I don't believe this. Aaron states that he tells Floyd that we should meet. So Nie, Steve and Aaron and Floyd meet and Floyd asks them to talk things out. Aaron states to us (Anne and Alfonso) that Nie walks by him without responding to Aaron's greeting.

Aaron states that Floyd confronts Nie and Steve and they said the Temps are saying this. Aaron said that he, Aaron told Floyd to interview the temps. Aaron said the temps were not interviewed.

Floyd states that Steve, Nie, and Aaron went to lunch together. Floyd also showed up. This took place in the first month that Aaron was here as a temp. Floyd stated that he asked them to go to lunch as a team building initiative. Floyd said he encouraged them to have lunch together and paid for the lunch. Floyd stated that he showed up later so that they could have some time to talk without him (Floyd) being present.

Aaron states that he confronted Nie and with Nie ignored him. Aaron and Nie have worked the issue out and Aaron states that there is more respect.

(Anne and Alfonso note that Aaron feels that these issues are very much in the present although it appeared to happen a year ago. The issues are still very fresh for Aaron.)

March 2016; Counseling Report (Aaron gives us a copy of the documentation)
Aaron states that he was called into a meeting with Don and presented with an Annual Performance Review and received a raise. Aaron states that he did not like the raise but he liked the review.

Aaron states that two hours later, "I was told that I was getting a verbal reprimand." (see documentation dated 3-23-16: Associate Counseling Report). Aaron states that he did not get training and that Don told him that he has to know everything that Floyd and Don know. Aaron refers to succession planning documentation.

Anne and Alfonso ask about the succession planning document. It sounds like a coaching document identifying competencies at the next level.) Note: Investigators reviewed this document.

Aaron states that "Floyd was harassing me."

(Anne asks for clarification on what was harassing.)

Aaron states that the succession plan is our way of letting you know that your performance is not up to par.

KANE000479

Floyd's response, "I never said that." Floyd is shaking his head. Floyd states that the succession plan is a tool to encourage associates to excel. "We point out areas that the associates can get exposure to." Floyd states that this is voluntary – evaluating yourself against the competencies.

(Anne and Alfonso advise Floyd that Human Resources should be included in these initiatives.)

Anne and Alfonso ask Floyd about Aaron and whether he was upset about his raise. Floyd states that he asked for $1.00 an hour raise and Teresa backed it off when he moved from Temp to a Kane Associate in October 2015. Floyd states that when he gave Aaron the raise, he was upset. Floyd said Aaron thought he would move to $18-19 dollars an hour. Floyd said, no this is the rate. Floyd stated that he was shocked; Aaron stated, "I hope you make it up to me on the annual raise." Aaron told Floyd that he was promised a lot more. Floyd said no, there has been no confusion on the rate. "I don't know where Aaron got these expectations. I have been doing this a long time", states Floyd.

(Note: Floyd is the leader at the Salt Lake Facility. Teresa Torrey is the Area Leader located in California. Floyd reports to Teresa.)

(Note: Aaron's review was completed in December and in the system for performance from Oct. – December 2015.)

Anne and Alfonso discuss the counseling report and review the documentation. Anne and Alfonso discuss how the counseling report should focus on the instance to be corrected. In this case, Floyd pulled in some other concerns that were not properly included. Anne and Alfonso advised that the Counseling Report would be pulled from Aaron's file. Future counseling reports should be done with the assistance of HR.)

Aaron states that he told Floyd that, "I was going to HR and that Floyd said he would not continue the succession plan."

When asked about this situation, Floyd states that the succession plan conversation did not take place during the Counseling Report; It was not during that conversation. Floyd states that he had dates set up that had been postponed. Floyd states that we usually spend an hour going through the succession plan. Floyd states that, "I did tell Aaron that he needs to feel comfortable with the job training, and until you feel comfortable, lets hold off on the succession plan." "I felt that it would be confusing." Floyd states that Aaron was not happy and did not understand. Floyd states that Aaron kept saying, "well, I guess we are not doing the succession plan." He said that a couple times.

Aaron said that Floyd did not tell Aaron to go to HR. Floyd gave Aaron Mari's phone number.

KANE000480

Floyd states that he asked Aaron to speak with Mari. "I have an email in support of this." Floyd states that Aaron twists conversations. Floyd states that Aaron constantly misunderstands conversations.

Regarding the Counseling Report, Aaron states that he did not miss the pallets. Aaron states that Cameron an LTO missed the pallets. Aaron relays that there was one pallet that did not get on the truck. Cameron was responsible. Floyd told me that I was responsible for Cameron's work. Don agreed with Floyd that Aaron is the LTO lead. These guys have damaged property (Nie) and not been written up.

Floyd states that Cameron loads 4 pallets and then Cameron sees Aaron wrapping the pallet and Cameron takes off thinking Aaron is going to load it. Aaron leaves the pallet on the wrapper and takes a break. The truck leaves without a pallet. Aaron doesn't understand the dock. Don keeps track of the lanes. Aaron is unable to keep track of the dock. Don spoke with Aaron, "can you wrap this pallet before it goes on the truck". Aaron is not connecting the process and does not think to finish the process. Floyd states that the workload has increased significantly and Aaron is not able to manage the dock.

Aaron states that he was on a break when Cameron was loading truck. (March 22nd); On March 23, Aaron said he did miss the pallet on the 23rd but were able to get the truck back and loaded the pallet. Aaron feels like the counseling report should be pulled.

Aaron states that he has not been trained properly. Aaron said that he has never been trained by SOPs or Standard Operating Procedures. Aaron states that he received on the job training. Aaron states that he was in a meeting with Floyd just last week; we talked about the SOPs. Aaron states the he leads the training for dock doors. Floyd told everybody that they signed off on SOPs. Aaron states that "I didn't know that we signed off on SOPs meant that we were trained."

Floyd states that he and Don observed the work and said that if the Associates felt comfortable with the work / process, the Associates signed off of the SOPs. If they did not feel comfortable they would be retrained. That is the process as this was a new facility. Aaron helped create the SOP's.

Aaron acknowledges that some of the current training he will be receiving is based on SOP. Aaron states that he created an SOP on receiving that they use now.

(Anne and Alfonso note the conflict in Aaron's statement on training.)

Floyd states that "we are a new operation and the SOPs are now being written. SOPs are in DMS now."

Aaron states that there was a comment made by Tony that Aaron did not like. Aaron states that Floyd approached him about helping the Rialto location. Floyd said, we heard you had

KANE000481

family in Rialto and they need help in Rialto and that you can handle everything in that area (referring to Rialto). Aaron asked to speak with Henry, the manager of the Rialto location so that he (Aaron) gets a good clear picture of what Henry was looking for. Aaron stated that Henry said we need help with waiving orders. Aaron stated that he has never been trained and Floyd was sitting there listening. Aaron states that he felt like Floyd was setting him up by not telling Tony my skill level. " I am glad to go out there and help."

(Anne and Alfonso note that Aaron is visibly upset. Aaron acts like he believes that he was being set-up.)

Aaron states that Tony said that there will be a lot of work and you can't drink and stay out late.

Investigators asked Floyd about the discussion. Floyd stated that Tony was talking about don't go down there and mess around. Some associates went down there and were drinking and got terminated. Floyd states that Tony was light-hearted, smiling and joking, however, Aaron came back the next day and was really angry. Aaron said to Floyd that he was setting him up for failure. Floyd had Aaron call Henry to get comfortable with the work assignment. Floyd stated that the decision was up to Aaron and that he (Floyd) thought Aaron might like the assignment because he had family in the area. Floyd stated that there was nothing more to it and was surprised by Aaron's reaction.

(Investigators note that the assignment was putting product in the racks; very basic work. Investigators note that Aaron is extremely bothered by what Tony said, angry and perhaps paranoid.)

Aaron re-states that he does not remember what Tony said exactly, just that he had to be on his best. Aaron said that he left (went home) and thought about what Tony said.

Alfonso restates the open door policy; and that Tony supports an open door policy.

04/20/2016- Recommendation was made by Anne and Alfonso to not send Aaron out to Rialto because he felt he was being set-up by Floyd and was exhibiting a lot of anger about not prepared with training required. Aaron stated that he was not happy with a comment made by leaders in reference to his help in Rialto. Aaron did not project that he was comfortable going to Rialto. Anne advised Aaron that we would not be sending him to Rialto based on his concerns and that it was strictly a voluntary assignment. After speaking with Floyd, Floyd thought Aaron would like the assignment. Anne advised Aaron, but Aaron's reaction was not one of relief. Aaron was angry and stated that he was told he could go to Rialto. Aaron stated that he made plans to see his family and that who made that decision that he could not go. Alfonso and I scratched our heads on this reaction. Aaron was even more angry about not going. We again explained to Aaron that it was our understanding that he was not comfortable going. It was an odd situation and we felt that Aaron was arguing both sides. Investigators then advised Aaron that he could take some time and decide if he was comfortable with the

KANE000482

job. After further discussion, Aaron confirmed that was comfortable with going but will let us know on 04/21/2016.

Aaron went back to the write-up and stated that he has an issue with the Productivity calculation. Aaron explained that if "we get a heavy day, we work together." Aaron states that Floyd put together a spreadsheet on calculating the time estimate of how long it should take. Aaron states that " I do this in my head. It's my opinion that it's another way for Floyd to look at my performance."

Floyd states that he is concerned that Aaron does not know what to do and doesn't understand the process. (Floyd said he showed Alfonso / Anne a report.) Floyd states that he created the report / dashboard to help Aaron. Floyd states that this is a tool used at other locations. Floyd stated that this is being used because the customer sent over 7,000 units and we needed to assess the man hours and number of associates to manage the work load. Floyd states that Aaron misunderstands what he says and twists his words. Floyd states that something is not right.

Aaron states that last month (March), Floyd went out about 11 am; we have only picked x, (implying not enough). "But what Floyd didn't know that we had a lot of replenishments. Floyd admitted to me and Don that he didn't know how busy the day was". Aaron stated that it was a good thing that Floyd acknowledged this.

Aaron states that a week later, "Floyd and Don started getting on me (referring to write up); said that I am responsible." You are the LTO Lead and you should know what is going on. All this stuff for me to do all of this and I don't know the people. I have to do the communication between Elliott. No one told me that. (Anne: referenced training). Aaron said that the training will help.

Aaron states that, "My guys leave before I do. I want to make sure that every pro sticker matches the "BOL". Aaron states that Floyd tells him that he needs to "manage backwards". Aaron wants to stay ahead of it. (Aaron) Floyd, you remember when Cameron (2 months ago) almost sent an incorrect load out. Cameron is loading the stuff in the wrong truck. Aaron told Floyd that had this truck come an hour earlier, it would have been loading incorrectly. Aaron does not think that managing backwards is the right way to handle it. Aaron states that he is asked me to manage backwards and that's when the issue occurred on March 22nd and 23rd.

Aaron states that he told Floyd that if "I was doing it my way, we would not have missed it. So I went back to the way I do it. I am responsible for anything the LTO's do wrong. I have to watch my butt here because something strange is going on."

Investigators note that Aaron thinks that someone is out to get him.

KANE000483

Aaron goes on to state that he has not been trained on the MHE Program. Aarons states that "Don and Floyd have responsibility for the MHE program." Aaron states that "Floyd is trying to blame me."

Investigators ask Floyd about training. Floyd states that the training is a video (about 45 mins.) The supervisor does an observation with the associate on each piece of equipment. All equipment operators get trained on the Material Handling Equipment. Floyd states that Aaron has never made that statement to him. (Alfonso is looking at the sign-offs and he has been evaluated on MHE; Aaron is a trained operator.)

Investigators note that there is a disparity in how Aaron perceives his training and the training records as well as Floyd's understanding. Aaron had completed a self-evaluation (succession planning document) in which he rated himself 4's and 5's, 5 being the highest score.

Aaron states that at the end of the performance discussion there were dates of November 11, Feb 16, and march 17th, and March 22. Aaron goes on to state that on Nov. 11, Aaron was told that he made Shannon feel afraid. (Note that Shannon Mayfield is no longer at the site and was an employee of Pro Logisitcs.) Aaron states that Kevin Mayfield was married to Shannon – both no longer here.

Aaron states that Shannon had several mis-picks; "Shannon was allegedly in the bathroom crying." Aaron states that Natalia said the reason for the mis-pick was her fault. Aaron states that Floyd gave this feedback to Aaron about Shannon and was upset.

Aaron states that "Floyd kept me in his office drilling me about this. Floyd called a meeting the following Monday – all of the Associates." Aaron states that Floyd talked to them first, and then called Aaron. Floyd said that the Associates had nothing but good things to say about Aaron.

Alfonso: clarification: Aaron states that Floyd held this meeting to get "bad information" on Aaron but that is not the feedback Floyd heard.

Floyd stated that he held this meeting at Aaron's insistence. Floyd stated that he told Aaron that this was not the right approach.

Aaron believes that Floyd was making up complaints about him.

Aaron states that Natalia approached Aaron after the meeting and said they had a good relationship.

Aaron states that in between this, Cameron damaged property and Floyd told him not to say anything about this.

Floyd states that there was a cable on the floor that caught Cameron's wheel. Aaron is the safety champion for the facility. Floyd states that he documented the safety incident; nothing was hidden. Floyd states, " I did not report it to Corporate Safety because I thought this was discretionary. I know that there is a preventable and a non-preventable on the reporting. I hid nothing."

Floyd states that Aaron told him about incidents with Nie and that Nie should be terminated. Floyd stated, "I have never asked Aaron to document disciplines or coaching. Aaron only makes a note and date of any call-ins. He is not expected to handle any coaching or discipline."

Aaron, going back to the write-up, states that (reference write-up and notation of Feb. 16th) Natalia claimed that she could not talk to Aaron. Aaron states that it was a receiving situation and Natalia didn't understand the process. Aaron states that Don trained me on how to handle this process. Aaron states that "Floyd drilled me on this, had me out in the warehouse. Product that was scanned differently on the ASN but wrong in the racks. Now, if it doesn't match the ASN, we call Nutribolt."

Aaron states that he believes that the March 22nd reference on the write-up was because he was following up behind his guys.

**3. Allegation: "Floyds inappropriate jokes in front of Safety Committee members"**
Please describe the incident: Time / Date / Situation (Sept. 2015 or Oct. 2015) Aaron states that he can find them in his notes.

Aaron states, "I came back to the safety meeting and Floyd told me that he told a Superman joke. Daniel said "I guess that HR is out of the window". Floyd then said he was in a restaurant with his wife and realized that a woman was choking. This other woman was giving her the Heimlich maneuver. The guy then kneels down, pulls her pants down and licks her butt. Shannon Mayfield was in that meeting. Aaron states that he told Floyd that he could not tell these kinds of jokes in the staff meeting.

Investigators agreed and said that this was a good way to handle it.

Floyd states, "Yes, I told the joke. At the end of the joke, haven't you heard of the heiny-lick maneuver?" Floyd states that "I got it".

Investigators explained to Floyd that jokes are perceived differently and this could have been very uncomfortable for associates. Investigators advised that they expect professionalism at all times.

Aaron states that a week or two prior Floyd told this joke; it was break time and he told the joke outside where the smoker's go. Aaron relays the joke about Superman flying around and

KANE000485

saw Wonderwoman lying naked on the bed, he didn't realize that the Invisible man was having sex with her."

Investigators ask Floyd about this joke. Floyd stated that, "Yes, I told the joke. "I won't do it again."
Floyd states, "Aaron never said anything to me. If someone had come to me, I would have never repeated it and apologized."

Aaron states that he told Floyd in February of 2016 that the "F" work can't be used out on the floor. Kevin addressed Aaron on it because Shannon was upset by it.

Aaron addressed it with Floyd and Don was there (October 2015). Floyd uses profanity and the "F" word. Aaron states that Floyd admitted in the it in the leadership meeting and that he would stop it.

Floyd states, "I was not aware (offensive) and nothing had been said to me." "Had it been brought up, I would have respected that."

Aaron states that there is still an issue with profanity, "I have some Associates that use profanity and Don and Floyd wont write them up."

Aaron states that at the end of March (2016), Floyd told Aaron that he is responsible for writing up the LTO's.

Floyd states, "Absolutely not. We had a discussion about this and all Aaron is responsible for doing is bringing any incidents to our (Don and Floyd) attention."

Aaron states that the catwalk was damaged and that Kevin Mayfiled damaged the air conditioning pipe and Floyd didn't do anything about it. Aaron, going back to his write-up states that Floyd wrote up Aaron and didn't write up these other people.

Floyd states that he did not report the damage to Corporate. "Nie was driving and the top of the reach bumped the catwalk. We didn't know the ceiling slanted, so I documented it and coached everyone because we were not aware of the issue." Floyd states that it would not have been fair to everyone because he did not know about the ceiling slant.

Floyd stated that Aaron was not aware, but that Nie did get written up for the drop boxes as a non-preventable.

Aaron goes on to state that Steve Jones was out for 5 days. Don and Natalia went to Steve's house to check on him. Don was writing him up. Floyd comes into the office, Don is writing up

Steve. Corporate policy states....no, Mari and I are working on something. Aaron states, "How does that make me feel, because I just got written up. (referring to the write-up earlier.)

Floyd states that Steve had been out 3 days sick. "Steve did text initially and he got a written warning, iff the 3rd day was a no-call no-show. The service turned off his phone so we went over to check on him. Don and Natalia chose to visit him on their own. I appreciated their follow up. Floyd states that they were worried about Steve because it was unlike him not call.

Aaron states that Dan Volpe had a problem that people were not being written up.

Aaron states that Don told him that Dan Volpe asked why damage was not reported.

Aaron states that Floyd said that Cameron left because he felt like he was micro managed by Aaron.

Regarding Cameron's departure, Floyd stated that he conducted an exit interview. During that interview, Cameron stated that he was making $1.50 more an hour and that he felt micro managed by Aaron. Floyd did share that with Aaron. Aaron seems to have turned into "the reason" and not one of the reasons. Floyd states that Aaron will often misunderstand or twist his words.

Aaron states that he feels that "Floyd is on a witch hunt" for him.

4. Allegation: "Floyd's failure to terminate employees for assaulting an associate on company property"

Please describe the incident: Time / Date / Situation (at least July – Aug. 2015 with Jordon, Mark and a girl – (no name / no longer her) temps with Pro Logistics.

Aaron states that "a girl was "messing" with Tony's food. I spoke with Tony and one of the pacific Island guys asks me what I was talking to Tony about. Jordan makes a beeline towards Tony, he picks Tony up by the shirt and Tony walks away. Aaron states that he tells Jordan that he can't put his hands on Tony. Aaron states "We are going to go talk to Floyd about this. Aaron states that Mark states that he is going to be Tony up. Aaron states that Tony went right to Floyd's office. Aaron states that he brings them into Floyd's office. Aaron states that Floyd says we've got to get along. Aaron states that this is not ok. Aaron states that Floyd didn't do anything about it. I felt bad for Tony. Aaron was really bothered that they stayed here for 2-3 weeks more. Aaron states that Don said he should have fired him. Tony was supposed to be hired. Aaron states that Floyd said there was an issue with Tony's background. Aaron states that, "Attorneys were getting involved; Tony was a homeless guy."

KANE000487

Floyd states that his understanding was completely different. "My understanding was that there was no physical confrontation. Josie wrapped Tony's burrito in her shirt. Floyd states that Aaron said absolutely nothing during the conversation. Floyd states that he then asked if he needed to buy a new burrito for Tony. Floyd states the was never made aware that there was a physical assault. Floyd said that, "Mark made a threatening remark. When I spoke with him, the comment that was made by Mark was "do we need to meet out in the parking lot". Floyd states that Tony and Mark both shook hands when they left. Floyd states that Aaron did not speak during the discussion. Floyd states that the situation was not conveyed in the way Aaron described.

Aaron states that does not know why Tony had to leave. Aaron states, "I don't have the right to question what they do. Tony was released suddenly." Aaron states that he had to be part of the meeting, Floyd was out of town. Aaron stated that Don told Tony that the background check can't bring him on board. Tony was an employee of Pro Logistics.

Floyd states that Tony failed a background check with multiple recent domestic battery misdemeanors. Floyd states that this was not public knowledge.

5. Allegation: "Floyd's negative comments about Corporate personnel"

Please describe the incident: Time / Date / Situation

Aaron states that Floyd consistently makes negative comments about Nancy Krueger. Aaron states that Floyd "refers to her as looking like a man." Then pulled her picture up. Aaron states that Floyd said this to Aaron in the December or January time frame. Aaron states that Don was also present. In our leadership meetings; he refers to her as "the witch from hell". Aaron states that at least once a month, Floyd says something negative about Nancy. Aaron states that Don can verify this.

(Anne has counseled Floyd on this matter, his professionalism and the standards we expect.)

Aaron states that Floyd never addressed break issues where Kevin and Shannon left on breaks together, before Aaron dealt with the racist comments.

6. Allegation: "Floyd subjecting me to double standards and harassment"

Please describe the incident: Time / Date / Situation

Aaron states that this pertains to the write up and not writing other people up. Getting on me every time someone says something about me.

Aaron states that Floyd calls him "a salesman." Floyd told me last week that I was his last choice. When I interviewed, I wore a suit. In the succession plan, I had rated myself at a certain

number and Floyd had an issue about it. (Nov. and Feb. succession plan meetings) Aaron states that Floyd stated, "Aaron, being book-smart doesn't get you anywhere in this industry." Aaron states that his "perception is that Floyd is jealous." Floyd said if we knew you didn't have any experience, we would not have hired you.

Aaron states that Floyd told Aaron that you don't know anything about the industry.

Floyd admits the conversation: Anne counseled Floyd. This conversation occurred before the write-up.

Aaron states that after the Corporate people left, Floyd made a comment about Tony's eyes. Aaron wonders why Floyd would even say something like that. "Its two faced" according to Aaron. Aaron let Floyd know. (Day after Corporate visit – end of March 2016.)

7.  Allegation: Floyd failing to reprimand associates for violating corporate policy
Please describe the incident: Time / Date / Situation

Aaron states that this allegation is about is about damaging property: "Nie tipped a pallet (2015 Feb / March) and someone could have been killed. "They (boxes) fell to the other side and fell to the ground. Lucky no one was picking on the other side." Aaron states that he sent pictures to Don. Don told Nie that he had to take a drug test. Aaron then asked Don if he was going to give the drug test and Don said no, Floyd doesn't follow the rules.

(Floyd is surprised by this accusation) Floyd states that they followed the protocol and it was reported. Floyd states that the doesn't make sense, "Aaron was in my office concerned that Nie would be fired." For the incident.

Aaron states that he has been subjected to (2) random tests. "I always ask for copies of stuff. The first test was done and signed (11-15). The second test I signed but it was not marked negative or positive (2-15-16)."

Floyd states that the drug test request comes from Angela (Burratti) at Corporate. Floyd states that he showed Aaron the email from Angela. Floyd states that Aaron flipped out and he was upset. Floyd states that Diane also had (2) tests.

(Anne / Alfonso – check on the 2nd drug test)

Aaron states that Floyd told Aaron that "we are not going to continue the succession plan" after the write-up. Aaron states that he considers this retaliation.

(Floyd is shocked by the investigators question and shakes his head.) Floyd states that Aaron had self-evaluated (succession plan questions) himself on his job responsibilities as very high,

KANE000489

but conversely claimed that he was not trained and did not have SOPs for his job. Floyd stated that it didn't make sense to work on future skills when Aaron stated he was having trouble with his current duties. Floyd stated that Aaron evaluated himself highly in terms of knowing his job but then claimed that he didn't know his job and was not properly trained and despite the fact that Aaron helped create some of the SOP's for the job.

(Investigators note that this does not make sense.)

Aaron states that when he addressed Floyd on the write up and that no one else was getting written up, Floyd made the comment that Aaron was supposed to be writing up people.

(Investigators addressed this earlier.)

Aaron states that Nie damaging property 3 times with no write-up.

(Investigators addressed this earlier.)

8.  Allegation: On 3/28/16, Don Maxwell called me into a meeting in his office and informed me that he needed to discuss my Hourly EE Performance Review (attached). Don discussed each area of the review and told me I was doing a "fantastic job". Within two hours of this meeting I was called into a meeting with Don and Floyd in Floyd's office and told I was receiving a "verbal reprimand" for "poor performance on the job" and presented with an Associate Counseling Report (attached). I feel the reasons outlined in the report are a double standard, harassment, discriminate, and unjustified, and is the result of my voicing opposition to the inappropriate behavior exhibited here at the Kane Salt Lake City warehouse. I am preparing documentation to support my concerns and will present this information to you soon. As a result of the treatment I am experiencing, I am requesting an immediate investigation by the H.R. Department into my concerns. Your assistance would be greatly appreciated.

Please describe the incident: Time / Date / Situation

Investigators looked at the verbal written counseling. This was a first step counseling in correcting mistakes. After further review Anne and Alfonso pulled the report due to a lack of details for specific dates that were outlined in the verbal warning. The mistakes lacked details for incidents that happened months after the mistakes were brought to Aarons attention. Although the errors did occur the failure to let Aaron know that these incidents happened did not occur until 03/28/2016. The verbal warning included a projected training schedule that would assist Aaron in closing the gap in his knowledge. Although the verbal warning has been removed, the training plan remains to assist with Aarons development. Aaron requested that he be trained in areas that he was not comfortable with.

Investigators advised Aaron that he would not go to Rialto based on his concerns about training and being "set up". Aaron got angry and asked if Floyd made that decision. Anne responded that she made that decision based on Aaron's concerns and that he did not have to go to Rialto, it was strictly voluntary. Aaron stated that he wanted to go to Rialto but then said he would let investigators know after he spoke with Teresa. (4/20/16) Investigators were puzzled by the response because Aaron conveyed that he was being "set up" and spent a lot of time stating that he was not properly trained. Investigators thought that Aaron did not want to go to Rialto. Aaron's response of anger toward investigators was surprising.

Alfonso / Anne – Observation that Floyd is not knowledgeable about documenting processes. Documentation is not going beyond the file vs. having the conversation with the associate. Floyd is a very trusting person. He has good intentions and states that he still wants to try and help Aaron.

Anne / Alfonso advised Floyd to cease the jokes, profanity and bring his professionalism up a level. Don is to supervise Aaron and Floyd is to remove himself from the coaching and supervising process. Alfonso will assist with any discipline. Alfonso to review training plan prior to administration and SOPs will need to be in place.

Responses from Don

1. Allegation: "Floyd's failure to reprimand an associate for making racial comments to me"

   This was a venting session for Erin, bringing anything he could, Kevin (temp) was accused of making the racist remark. Aaron put him on the spot when he used the word boy.. Aaron called a meeting. Don didn't feel this was necessary but wanted to satisfy Aarons want to sit down with the team.

   Don stated he feels the team as a whole are all responsible to get to the right individual on a one on one basis for feedback. "We need to follow up on the situation as managers."

   Kevin and Aaron were not involved in any kind of altercations.

2. Allegation: "Floyd's fabrication of information from associates about me"
   Don was part of that meeting with Steve, Nie, Natalia all Kane associates. The meeting discussed that the team felt like he didn't have good knowledge, several shared that he wasn't the person for the job. Don says Aaron asked for the meeting. Aaron said he would need to take on the comments and hear them out for himself from his team

   Aaron kept pressuring them to ask them what he said was wrong. Don dropped in time to time but wasn't fully part of the meeting. He felt the meeting was taking a while to get through the meeting so I needed to go. Don acknowledged that this forum was controlled.

3.  Allegation:  On 3/28/16, Don Maxwell called me into a meeting in his office and informed me that he needed to discuss my Hourly EE Performance Review (attached).  Don discussed each area of the review and told me I was doing a "fantastic job".  Within two hours of this meeting I was called into a meeting with Don and Floyd in Floyd's office and told I was receiving a "verbal reprimand" for "poor performance on the job" and presented with an Associate Counseling Report (attached).  I feel the reasons outlined in the report are a double standard, harassment, discriminate, and unjustified, and is the result of my voicing opposition to the inappropriate behavior exhibited here at the Kane Salt Lake City warehouse.  I am preparing documentation to support my concerns and will present this information to you soon.  As a result of the treatment I am experiencing, I am requesting an immediate investigation by the H.R. Department into my concerns.  Your assistance would be greatly appreciated.

We gave Aaron the review after 7 weeks. A lot of things that were listed were pretty well average.

Two LTO drivers (Nie and Steve) called out a discrepancy. Natalia went to the team and reported that they weren't coming to him but to Natalia. Happened between the week or two before he signed on Mid-March.

The team went to Floyd with those concerns not Don. It was asked of Don what the next steps should be for when people make mistakes. Don stated that Floyd made those decisions. He simply reported opportunities to Floyd.

Training: Floyd told Don that he wants him to retrain Aaron. Ask questions like "What you can do?". What are his (Aarons) Freedoms and restrictions? Started to release a lot of that to him, stating the can set expectations. This was when Floyd approached Don about Don being the "Frontline" supervisor and that he is now accountable for all of his training.

4.  Allegation:  Floyd failing to reprimand associates for violating corporate policy
Please describe the incident: Time / Date / Situation
Damaging property:  Nie tipped pallet (2015 Feb / March); someone could have been killed. They fell to the other side and fell to the ground.  Lucky no one was picking on the other side. Sent pictures to Don.  Don told Nie that he had to take a drug test.  Aaron then asked Don if he was going to give the drug test and Don said no, Floyd doesn't follow the rules.

Yes; Aaron sent information to Don. Don sent over pictures to safety committee and never received anything back about a drug test. Don was not aware of any needed next steps.  Don will reach out for help when in needs policy help.

KANE000492

Responses form Nie-

1. Allegation: "Floyd's fabrication of information from associates about me"

Don and Floyd never talk bad about anyone on the team. They treat everyone with respect.

I get along with everyone, I might have not agreed with everyone all the time but not to the point that I don't get along with them.

"Do you get along with Leadership"-Alfonso

Me and Aaron are "cool" we've all brought things that need to be fixed  to each other's attention. We work as a unit here. We are small and sometimes we have to scratch each other's back from time to time.

2. Allegation:  Floyd failing to reprimand associates for violating corporate policy
Please describe the incident:  Time / Date / Situation

"Has there ever been unreported damages or mistakes"- Alfonso
        We've always reported everything to Floyd , Don or Aaron.

"Do you Like working here"- Alfonso

I like it, sometimes slow but sometimes a lot of work but its cool.


Responses from Natalia-
3. Allegation: "Floyd's fabrication of information from associates about me"

We all have a job to do and if we have a compliant about someone we usually go to that person. It hardly ever has to be taken to Don or Floyd. Don and Floyd have never told me anything bad about a person.

"Any times when it has gone outside of the peer to peer level?"

One time with Aaron were he said I made a mistake and he was missing some information. Aaron was upset and we all sat down to talk about what needed to be fixed. (couldn't remember the time-few months ago)

KANE000493

"Did that work?"

Yes, somewhat. I feel like Aaron still gets mad at Floyd or Don when they say something has to be done different.
Any examples?

Little things like how to use certain people to do stuff, Aaron and Floyd are strong leaders and sometimes it seems like they want to always be the right one.

I liked it because it gave us a chance to speak our mind.

"Do you get along with Leadership"-Alfonso

I get along with everybody. I have never had a problem working here with anyone.
    4. Allegation: Floyd failing to reprimand associates for violating corporate policy
Please describe the incident: Time / Date / Situation

"Has there ever been unreported damages or mistakes"- Alfonso
We report all mistakes in my department to the customer and Floyd.
"Do you Like working here"- Alfonso
I love it. I like the people and my bosses.

KANE000494

# EXHIBIT C

Claimant:      Aaron Sampson
Supervisor:    Don
Date of Hire:
Location:      Salt Lake City Terminal
Date / Time:   4.20.16 at 11:26 am
Meeting Date 6/15/16 at approximately 4:30 pm
Interviewers:  Anne Cooper, J.D., SVP Human Resources
               Alfonso Yslas, Human Resources Manager

Re:  <u>Review of Findings with Aaron Sampson</u>

Result: Anne Cooper and Alfonso Yslas did not find discrimination regarding the complaint received and investigated on 4.20.16.

- (1) Our investigation results indicate that Mr. Mayfield was addressed on his behaviors; Mr. Mayfield was with the Pro Logistics firm and left the Kane assignment in December 2015.  Prior to the complaint received by HR.  There was discrepancy between what Aaron said he reported and what Floyd said was reported.
- We did not find any demeaning activity including the development tool used for succession planning.  In fact, we found a willingness to promote career growth and job understanding.  The activity was voluntary.
- (2) The allegation against Floyd of fabrication about information and lies against Aaron seems to have been solved by Aaron.  They had a team building lunch to settle their differences.  Aaron states that he and Nie have worked out their differences.  It would appear Floyd supported resolution by encouraging team building.  At the time of the investigation, we did not have anything to indicate further issues.
- Investigators have removed the Counseling Report.  It should address the work related concern specifically.  Other concerns were pulled into the counseling that should have been handled separately.

KANE000985

- The wage rate is consistent at this site as well as other Kane sites for the position of LTO and is based on local market wage rates.
- (3) The Company has addressed the concern of the instance of two jokes shared to the larger group of associates, not directed at Aaron, but were found to be inappropriate and addressed.
- There was one instance of profanity in which Aaron addressed directly with his supervisor and leadership agreed with him that it was inappropriate.
- Corporate reporting process for damage to assets is handled by the leadership and Corp. safety. A safety write-up on Nie was given previously.
- (4) Regarding the claim of "Failure to terminate a temporary employee for assaulting a temporary employee", we were unable to substantiate the claim. There were significant differences in what was reported from Aaron's perspective and Floyd's perspective.
- (5) Negative comments about corporate personnel was addressed
- (6) We did not find any evidence of harassment.
- (7) The discipline of others is not something that we will share.
- (8) There was no finding of discrimination with respect to the Counseling Report; the Counseling Report was removed.

Interviewers' Note: We greeted Aaron in the conference room and it was approximately 4:30 pm. Aaron appeared agitated and angry. Anne advised Aaron that the investigation was complete and that we would review the findings. Anne also advised Aaron that we had been receiving his emails, concerns and would also begin investigation of his new concerns. Anne began to review the findings with the initial finding and then began to walk through the specific allegations. Aaron interrupted and directed the conversation to Alfonso. Aaron was clearly agitated and accused Alfonso of lying. Aaron stated that Alfonso lied about a conversation regarding whether any other discipline had been given. Aaron stated that he was the only one that had ever been given discipline. Alfonso advised Aaron that Aaron was not understanding what he had said during the investigation. Alfonso clarified in subsequent conversations and email advising that Aaron was taking his statement out of context. Aaron leaned across the table and said that Alfonso was a liar and called him a liar a couple of times. Aaron then focused his attention on me and asked me, "How do you feel about having an employee that is a liar?" Aaron was angry and now his anger was focused on me.

Aaron was claiming that Alfonso told him that Aaron was the only associate hat was ever written up. Aaron also said that Alfonso said "Alberto" was not written up for previous mistakes. Alfonso clarified that he did not know about Alberto's case because he wasn't aware of any write ups for other associates. Alfonso was assigned the site when "Alberto" was separated. Alfonso mentioned he was only there to discuss Aaron's counseling.

Anne addressed Aaron and stated that Aaron was not understanding what Alfonso was saying. I stated to Aaron that he was twisting Alfonso's words. I stated to Aaron that he appeared to be very angry and that his behavior towards Alfonso was attacking and belligerent. I advised that this behavior was not appropriate and we should focus our time on the meeting purpose.

Aaron visibly calmed down. I went through a few more points and Aaron and then Aaron asked if I know about the policy of management reporting concerns to HR. I was not sure what Aaron was asking or if he was making a statement. Aaron was again agitated and Aaron said that he had the policy. I said "ok". Aaron wanted to stop and review the policy now. I said that we would not stop and review the policy right now, but asked if he had a question. Aaron asked if Management had an obligation to report issues to HR immediately. Alfonso advised that it depended on the issue, but yes, management typically will advise HR of a personnel concern.

I directed the conversation back to the review. Aaron was still angry and wanted to focus on the policy. Aaron had a few questions and then we started to wrap up the review.

Aaron then asked to review the break policy. Aaron said Don explained that the new break policy was created so that he would not be able to communicate with HR. Don also came into the conference room and in his presence Aaron reversed his claim and mentioned that Floyd told him that the new break and lunch policy was made specifically so that Aaron discontinue his communication with HR. Aaron was again agitated and complained that the break policy did not allow him to contact HR while he was on his break. Alfonso responded by saying that Aaron exercises the open door policy and we have regularly received his feedback and complaints. Aaron complained that he had to bring in his own computer and had to document his complaints in the breakroom. Alfonso stated that Aaron also had the ability to call Alfonso at any time and done so in the past. Aaron stated that he preferred to communicate to HR by email and could not do so during his breaks and lunch because the new policy did not allow him to do so. I advised Aaron that it is appropriate to set a break and lunch time. I also advised that I would look in to his concerns and that our goal was to maintain an open door policy.

Aaron left the room angry. Alfonso and I discussed that fact that Aaron did not seem interested in the investigation de-brief. He was focused on his next set of complaints.

Prior to departing the facility, Floyd and Don reported that Aaron had been observed going through the desk of Diane, who handles the front desk reception area. Floyd also advised that Aaron had been observed by Natalia going through the desk of Don, his Supervisor while Don was on vacation. Floyd commented that this was very strange behavior and since that time, both Don and Floyd have locked their office doors at night in addition to setting the alarm. Floyd states that he has locked file cabinets and did not need to lock his doors until now. Floyd reported that his locked file cabinet was also found open. Alfonso and I will look into the matter on Thursday morning. The behavior sounds erratic and bizarre – we are both concerned.

6/16/16

Alfonso speaks with Diane and receives her statement verifying that Aaron in fact went through her desk while she was standing there and against her protest. Natalia also confirms that she saw Aaron going

KANE000987

through drawers in Don's office.  Alfonso and I will follow up after statements are received.  We are both concerned.

KANE000988

# EXHIBIT D

**Aaron Sampson**

| | |
|---|---|
| **From:** | Aaron Sampson |
| **Sent:** | Monday, May 09, 2016 12:10 PM |
| **To:** | teamsampson@yahoo.com |
| **Subject:** | FW: Aaron Sampson - Opposition to Associate Counseling Report |

**Aaron L Sampson ♦ LTO Lead**
Nutrabolt, SLC ♦ Kane Is Able
1865 South 4490 West Salt Lake City Utah, 84104
*Dependable People. Exceptional Logistics*
801.973.6693



**From:** Aaron Sampson
**Sent:** Friday, May 06, 2016 3:13 PM
**To:** Mari Pena <mari.pena@kaneisable.com>
**Cc:** Anne Cooper <anne.cooper@kaneisable.com>
**Subject:** RE: Aaron Sampson - Opposition to Associate Counseling Report

Hi Mari,

I have not received a response regarding my email request (below) from you, Ann, or Alphonso. Please let me know if any of you intend to honor my request. I would also like you to investigate a situation with Floyd Kearl that took place on 4/22/16. On 4/22/16, Floyd Kearl subjected me to inappropriate comments, harassment, retaliation and intimidation. During a pre-shift meeting with the associates, Floyd held a discussion about inappropriate behavior and inappropriate comments and made the following statement while staring at me. "I hope that no one feels that they should go outside of our team if they feel uncomfortable about something". "If something happens, we don't need people here who take things where they don't need to be". After the meeting Daniel Novotny came to me and asked was I "OK'. Marina also approached me and asked "what was going on". I feel Floyd intentionally targeted me when he stared at me in front of the other associates while making his comments. I feel this is a continuation of the harassment, retaliation, intimidation, and discrimination I am experiencing here at the Salt Lake facility. As you know, I have previously complained to you about Floyd's harassment when he subjected me to questions about recording a conversation held in his office. I am requesting an immediate investigation into Floyd's inappropriate behavior. Your assistance is greatly appreciated.

**Aaron L Sampson ♦ LTO Lead**
Nutrabolt, SLC ♦ Kane Is Able
1865 South 4490 West Salt Lake City Utah, 84104
*Dependable People. Exceptional Logistics*
801.973.6693

1

**000482**

# EXHIBIT E

**Investigation Draft**

Claimant:       Aaron Sampson

Supervisor:    Don Maxwell

Date of Hire:   (confirming July 2015)

Location:        Rialto, CA Kane Warehousing Site and Salt Lake City Terminal

Date / Time:   06/22/2016

Interviewers:   Anne Cooper, J.D., SVP Human Resources

                     Alfonso Yslas, Human Resources Manager

Parties interviewed: Aaron Sampson, Claimant

Henry Ortega – Distribution Center Manager,

Brian Berliner – Warehouse Supervisor (Aaron refers to as Quality Manager)

Eric Garrett – LTO

Serena


**Regarding the complaints, Aaron Sampson has provided a written detailed list of his complaints and concerns as noted by numbers (1) – (8) below.  Where it was appropriate, we discussed confidentiality of investigation and 'no retaliation' with the parties.**

> 1. **(Aaron) During the week of April 25th - April 29th 2016, I was assigned to the Kane/Rialto facility to assist with the Carrier account.  While at the Rialto facility, I was subjected to the "N-word" several times.  On one occasion, Henry Ortega was present, on another occasion, the quality manager was present**

Henry states that he never heard any such word during the time Aaron was here.  Henry states that Aaron never reported anything like this.  Henry states that his interaction with Aaron began with a safety walk of the building, PPE, checking out forklifts.  Henry was aware that Aaron had requested "what did he need to know".  This was communicated to Floyd and that he would use the same Manhattan system. When Aaron arrived in the late afternoon (3:00 pm), Henry stated that Aaron would not have to perform lead forklift driver duties, but just the regular duties of a forklift operator which was picking and putting away orders.  No concerns were expressed by Aaron at that time.  (Henry states that Aaron had arrived the day before and it was odd that he did not report until late afternoon; Aaron was expected in the morning.  No one else was available for the safety walk, so Henry handled it himself.)

The next time Henry interacted with Aaron on the second day when Aaron was learning some new training, the picking process and putting away orders.  Henry said that went well – no issues or concerns expressed by Aaron.  Aaron asked what time he should come in.  Aaron expressed flexibility in coming in early or later.  Aaron came in early (being first shift) during his time in Rialto.

Henry had start of shift meetings that Aaron attended with the rest of the team. Henry states that they had multiple start-ups so there was not much one-on-one time with Aaron other than Aaron's first day during the safety walk.

Henry states that he has never heard the "n" word uttered in this facility nor would he every tolerate the "n" word being said in his facility. Henry is surprised that such an accusation would be made and that no one ever made him aware that such an accusation was made. We also have a hot line that is posted by the time clock. Alfonso and Teresa were also on site at that time.

**Henry states that this incident never happened. Just to be clear.**

<u>Investigators note</u> that there is no Quality Manager position in Rialto, however, there is an Warehouse Supervisor (Brian Berliner). Henry states that the only time that Henry was with Brian and Aaron at the same time was on Aaron's first day for the safety walk and possibly in the group start of shift meeting. Henry states that there are approximately 10 or more associates at the start of shift meeting and these meetings are staggered.

Brian states that he has never heard the "n" word being used. Brian has been in the facility since Nov. 4, 2015. Brian states he has never heard the "n" word being used ever, and states that he would personally take offense to that kind of language. Brian states that "Absolutely Not!" Brian states that the "n" word was never used in front of him and Aaron never brought anything like this to Brian's attention.

Brian states that he had very minimal interaction with Aaron, because Aaron worked on the Carrier account. Brian states that he had one conversation outside (sitting outside on lunch break) with Aaron and thanked him for coming out and helping out. Brian states that Aaron stated that he would, "love to come back and help out at any time.) Brian states that Aaron told him that he would go see some family that was in the area.

Brian states that he was sitting at his desk and Aaron approached him there. Brian asked him how it was going and he said that everything was going fine and that he was there to help and work.

Brian states that the culture is respectful and has no reason to believe that anything of this serious nature would happen. Brian states that he cannot even say the word – too offensive and not tolerated.

> - **(Aaron) I also experienced a safety incident where a truck driver moved his truck away from the dock while I was unloading pallets. I met with Henry and asked how and why the unloading incident occurred and expressed my feelings about the use of the "N-word". Henry said he would look into both incidents and did not get back with me. Henry also did not report my concerns to H.R. as outlined in corporate policy. As a result, I requested a "glad lock" when loading and unloading trucks as practiced in the SLC facility.**

Henry states that this conversation with Aaron never took place. There was no conversation about the "n" word. There was no conversation about locks. Perhaps Aaron spoke with someone else. Henry states that Aaron was not working on off-loading trucks; he was specifically trained to put away product from the dock and take product from storage to the dock to ship out. Aaron was not tasked to load product in trailers or off load product in trailers. Aaron was not trained on our locking system. Henry

advises that the forklift operator who is tasked to load and unload the truck has responsibility for the lock-out tag-out. Aaron is used to a "glad-lock" system, Rialto uses a "red-hasp" lock-out tag out. Different from a "glad lock". Henry is wondering what Aaron was doing in a trailer. He was not trained to do that work and Henry was Aaron's Supervisor.

Henry states that he did not have any concerns to look into because Aaron never reported any. Henry finds this very odd. Both Alfonso, Teresa, and Floyd were present at the Rialto site. Investigators note: Teresa, Alfonso and Floyd confirm that they were not aware of any concerns from Aaron.) Henry states that he has a multi-cultural workplace. There is a fast pace to the work; every one helps each other and there is an eagerness to learn. Overtime is less because the learning curve has gone down. The team has regular communication meetings and we have a respectful culture. Our associates work together as a team.

> - **(Aaron) I am also requesting an investigation into the racial comments (use of the N-word) freely used at the Rialto facility. I feel that the N-word is accepted as part of the Kane/Rialto culture and is inappropriate. I also feel that safety issues (truck driver pulling off while I was unloading his truck) are serious issues and should be investigated. I feel that Henry's actions are inappropriate, discriminate and a violation of corporate policy.**

Henry states that these allegations / events did not occur, "It did not happen." There were no racial comments made. Aaron never had a conversation with Henry reporting use of the "n" word.

Henry states that he is not aware of a truck driver pulling off while unloading. Aaron was not assigned to load or unload trailers. Aaron's comments don't make sense. Such a scenario would require a driver to have to back-in. There would be witnesses, because this would be a major disruption to the process. The driver would have to un-chalk and go through a process that it would be so obvious that the driver was pulling out. There is a process including paperwork that the driver and Kane have to sign off on. Additionally, the driver has to pull around from the dock to the shipping / receiving area.

Eric Garret – LTO, African American Male. Eric stated that Aaron criticized our efforts, that things were different. Eric stated that he loaded, unloaded and received product in Eric's role. Eric states that Aaron was here about 4 ½ days. Eric stated that Aaron said one of the trucks was not chalked properly and that Aaron would not attempt to load the truck because it was not properly chalked. (Aaron's statement conflicts in that Aaron said he was loading a truck and the truck moved.) Eric believes that Aaron reported the truck not being chalked. Eric and Aaron said "hi" to each other every morning. (Serena and Henry were in the area). The only issue reported to Eric was that the truck was not chalked.

Question for Eric: Have you ever heard of any offensive comments made to you, to other associates? Eric states that he has never heard of anyone disrespecting anyone else. Eric states that if there was disrespect, it would be reported, someone would say something. Anne clarifies: among the associates are disrespectful words used? Eric says no, "if there was disrespect it would be reported."

Serena – do you remember working with Aaron Sampson? Serena states that she was working and he was picking and pulling. Serena states that he was unloading and the trailer left. Serena didn't see what

happened but that Aaron was upset about the truck leaving and the safety procedure.  Serena states that she thought it was reported to Henry.  Serena states that the was talking to Henry about it and that they had only one lock and it didn't have a key.  Serena states that they ended up getting locks a couple weeks ago.  Aaron was pretty worked up about it.  Serena states that Aaron was doing a lot of off loading.  (4 – visitors from Carrier / a week before Carrier).  We were doing a lot of receiving and put-away.  He was starting to pull a little bit more.

Serena states that the jack stand was missing for at least two months, we did not have personal locks for about a month.  Serena states that there are about 5 locks but they are not assigned personally.

Investigators immediately spoke with John Hurst, SVP of Operations and Teresa Torrey regarding the lockout tagout procedure.   A safety discussion ensued with follow corrections to be implemented on lockout tagout procedures and individual locks to be issued.

Investigators note the discrepancy in Aaron's work assignment.

(The remaining allegations pertain to Salt Lake City Terminal)

> **2.  (Aaron) On or around May 25, 2016, Noki took an unauthorized break to smoke a cigarette.  While on the break, he missed the FedEx pickup driver for overnight packages.  We contacted FedEx dispatch and they had the driver return later in the day.  I informed Floyd and Don about the situation and Noki was not reprimanded for his actions.  I feel the failure to reprimand Noki is discriminate and a violation of corporate policy.**

**Investigators note** that Aaron would not be aware of any coaching or reprimand.   Also, it is not Noki's responsibility to ensure the delivery of packages to FedEx.  It is Aaron's responsibility to ensure the FedEx package pick up.  Aaron has a responsibility to send an end of day report regarding any issues.  Aaron did not reflect his concern regarding Noki in this report.

**Investigators note that the allegations below pertain to the Salt Lake City Operation**

> **3.  (Aaron) On or around 5/27/2016, I caught Andrew Castillo operating MHE without a certification or proper PPE.  I informed Floyd and Don about the situation and Andrew was not reprimanded.  I feel Floyd and Don's actions are inappropriate, discriminate and a violation of corporate policy.**
>
> Investigators note that Floyd found out about this situation when the team was having a safety discussion.  Andrew took it upon himself to start training before his actual training plan was built.  Floyd did address Andrew and reinforced the requirement for proper certification and operation of equipment and PPE.

KANE000992

4. (Aaron) On 6/2/2016, Don Maxwell approached me at my desk while I was on my break to discuss the box inventory. At the time, I was working on an email to be sent to the Kane H.R. Department regarding my complaints of discrimination. Later I entered Don's office to discuss training. At the conclusion of the meeting Don stated "one more thing", "what was that file you were working on"? I told him it was documentation I was preparing for corporate H.R. Department. Don then told me that I need to be spending "35% of my time on MHE and the rest on LTO Lead activities". I told Don that I was on my break. The following day 6/23/2016, I was presented with a document (Kane Salt Lake City Break & Lunch Schedule) and told in a pre-shift meeting that Kane "corporate" contacted Floyd and Don and stated "the SLC facility is the only facility that allows it's associates to "take breaks whenever they choose" and this practice was a "security threat". I was required to sign the document. Later that day I approached Don to clarify the "instructions" in the document. I asked about instruction #2 and #5. Instruction #2 states; Breaks are to be taken in the breakroom and /outside only. Instruction #5 states; Please refrain from being in the warehouse or at your work area during breaks and lunch. I asked Don "does this mean that I am no longer allowed to be at my desk during breaks or lunch. Don told me this was no longer allowed. I feel that the new policy is discriminate and an attempt to stop me from communicating with H.R. to address my concerns of discrimination while at work. I also feel that Kane is Able is subjecting me to systematic discrimination, harassment, and retaliation by implementing the policy stated by Don in the pre-shift meeting.

Investigators note that Aaron regularly contacts HR and has been doing so on almost a daily basis. Management is appropriate in setting break times and lunch times to ensure its associates take breaks and lunches during the work day.

5. (Aaron) On 6/6/2016, I approached Diane to inquire about the address to corporate. At the time Diane was taking her break in the conference room. I told her I did not want to interrupt her break and I would get talk with her later. I feel that Diane is receiving preferential treatment and Don and Floyd's allowing her to do so are a violation of the new corporate policy.

Investigators note that Aaron is unhappy with the break policy. There is no evidence of preferential treatment. There is no prohibition on lunches in the conference room.

6. (Aaron) On 6/6/2016, I entered Don's office after my meeting with the Safety Committee. I was surprised to find that Don was having a meal at his desk after implementing the corporate policy in our pre-shift meeting that prohibits me from doing the same. I feel that Don's actions are discriminate and a violation of the new corporate policy.

Investigators note Aaron's displeasure with the break policy.

7.  (Aaron) On 6/6/2016, Don informed me that he allowed Noki to take his break with Nai and Steve instead of the scheduled break time outlined for him in the new corporate policy implemented in our pre-shift meeting. I feel that Don's actions are inappropriate, discriminate and a violation of the new corporate policy.

    Investigators note Aaron's displeasure with the break policy.

8.  (Aaron) On 6/8/2016, I witnessed Diane taking her lunch in the conference room which is not allowed in the new corporate break policy.

    Investigators note that the break policy was presented to the entire team and not just Aaron. There is no prohibition on lunches in the conference room.

9.  (Aaron)On 6/8/2016, Floyd and Don admitted that they are allowing Diane and Natalia to violate the new break schedule policy and take their breaks and lunches in the conference room.

    Investigators have confirmed the break policy with Management. There is no prohibition on lunches in the conference room.

# EXHIBIT F

Claimant:        Aaron Sampson

Supervisor:      Don Maxwell

Date of Hire:

Location:        Rialto, CA Kane Warehousing Site and Salt Lake City Terminal

Investigation    06/22/2016

Meeting Date:  7/20/16

Interviewers:    Anne Cooper, J.D., SVP Human Resources

                 Alfonso Yslas, Human Resources Manager


Re:  Review of Findings with Aaron Sampson

Result:  Anne Cooper and Alfonso Yslas were not able to substantiate Aaron Sampson's claim that the "N-word" was used in Aaron's presence or in the facility in general.

- The Rialto facility is a multicultural workforce at all levels.  It is a small workforce of Kane Associates comprised of Henry Ortega (Hispanic male), who runs the facility, Brian Berliner (white male) who is the Warehouse Supervisor, Eric Garrett (African American male) who is the lift Truck Operator and Serena…. (Hispanic female).  The Team reports into Teresa Torrey (Hispanic female).  There are also varying number of temporary employees.  This is a fast-paced environment where team work is critical and everyone helps each other.

- (1) Our investigation results indicate that Mr. Sampson only reported his concern about use of the "N-word" to HR after his assignment at Rialto ended and more than several weeks after the alleged incident occurred.  It is also important to note that Floyd was on site assisting with the start-up at the Rialto facility and did not receive any concerns from Aaron during or after his brief assignment that lasted less than one week.  Henry, Teresa, and Brian did not receive any concerns regarding inappropriate language or atmosphere.

- Investigators could not find evidence to substantiate use of the N-word at the Rialto facility as alleged by Aaron Sampson.  Both Henry and Brian were shocked by the allegation as was Teresa.  All vehemently denied hearing any use of such language.  Henry and Brian stated that he would never tolerate the use of such language in his facility.

KANE000995

- Henry recounted his interaction with Aaron including morning start-up meetings in which Aaron had access to Henry. Henry also advised that the Hot-Line phone number run by a third party is posted at the time clock.

- Investigators note that Teresa and Alfonso were also on site at this time due to the start-up and nothing was reported. Alfonso regularly received communication from Mr. Sampson but nothing was said during this time regarding the alleged use of the "N-word".

- The was no time frame or date reported by Aaron during our discussion on 6/16/2016 regarding his allegations so we used open ended questions and approached the matter from the perspective of whether such language was heard during the time frame that Aaron worked or any time frame.

- Brian states that he has never heard the "N-word" used in the facility and it was never used in front of him with anyone including Aaron. Brian goes on to state that he has worked in Rialto since Nov. 4, 2015 and that he would take personal offense to such language. **In fact, Aaron told Brian that he "love to come back and help out at any time" and that Aaron would go see some family in the area. Brian states that the conversation took place outside and started with Brian thanking Aaron for coming out to help at the facility.**

- Both Brian and Henry state that the culture is respectful. Investigators note that this is part of our Kane Code and supported by our Hot Line number, annual Kane Culture Survey and encouragement of our open door policy to address concerns.

- Aaron Sampson also complained of an unauthorized smoke break, PPE, and designated break times for the facility. Investigators confirmed that the break policies are being handled appropriately.

Investigators were unable to find any evidence of use of the "N-word". Further, investigators were unable to find any evidence of a poor, hostile or even an unfriendly work environment. To the contrary, investigators found a diverse, small, collaborative work team that heavily relies on each other to accomplish their daily work. Investigators also note Aaron Sampson's comments to Brian and that he wanted to come back anytime and work with the Team - directly conflicting with his complaint.

KANE000996

# EXHIBIT G



Dependable People. Exceptional Logistics.

Internet: www.kaneisable.com          Post Office Box 931          Email: info@kaneisable.com
                                       Scranton, PA 18501-0931
**MEMORANDUM**                         800.845.KANE

<u>By Overnight Delivery-Signature Required, and</u>
<u>By 1st Class Mail</u>

TO:        Aaron Sampson
FROM:      Anne Cooper, Sr. VP, Human Resources
DATE:      July 29, 2016
SUBJECT:   Investigation - Discrimination/Inappropriate Conduct by Employees, Manager,
           Others – Rialto: Summary of Findings and Conclusions

Aaron:

We conducted a thorough investigation into your allegations of inappropriate and wrongful, if not
unlawful, workplace conduct which you claimed, on June 3, 2016, to have witnessed in our Rialto,
CA facility while on temporary assignment there five weeks earlier - April 25-29, 2016. I planned
to review our findings with you in person last week when I came to our Salt Lake facility to meet
with you, but you called off late the day before and did not come in. I then planned to do so
yesterday, in the pre-meeting that was to be held in conjunction with your scheduled to return to
work, but you never showed up for work. Therefore, I have now prepared this summary of our
relevant findings. Briefly, we found your allegations to be without merit – wholly unsubstantiated
and lacking any credible foundation or support. The details follow.

I note that your allegations of inappropriate, wrongful and/or unlawful conduct at the Rialto facility
were contained in a single paragraph within a multi-page document that you emailed to our HR
representative for Salt Lake City and Rialto, Alfonso Yslas, on June 3rd, primarily alleging
violations of corporate policy and discriminatory treatment at your "home" (Salt Lake City)
facility. Here is what you wrote regarding Rialto (the subject of this Memorandum):

"During the week of April 25th - April 29th 2016, I was assigned to the Kane/Rialto facility to
assist with the Carrier account. While at the Rialto facility, I was subjected to the "N-word"
several times. On one occasion, Henry Ortega was present, on another occasion, the quality
manager was present. I also experienced a safety incident where a truck driver moved his truck
away from the dock while I was unloading pallets. I met with Henry and asked how and why
the unloading incident occurred and expressed my feelings about the use of the "N-word".
Henry said he would look into both incidents and did not get back with me. Henry also did
not report my concerns to H.R. as outlined in corporate policy. As a result, I requested a "glad
lock" when loading and unloading trucks as practiced in the SLC facility. I am also requesting
an investigation into the racial comments (use of the N-word) freely used at the Rialto facility.
I feel that the N-word is accepted as part of the Kane/Rialto culture and is inappropriate. I also
feel that safety issues (truck driver pulling off while I was unloading his truck) are serious

Aaron Sampson
Rialto Investigation – Summary of Findings and Conclusions
July 29, 2016
Page 2 of 3

issues and should be investigated. I feel that Henry's actions are inappropriate, discriminate and a violation of corporate policy."

Below is a summary of our findings and conclusions regarding your allegations. In drafting this, I broke your allegations into three distinct parts:

1. **Your allegations that during the week you worked at the Rialto facility (April 25 - 29, 2016), you were subjected to the "N-word" several times, including once in the presence of our Rialto facility manager, Henry Ortega, and once in the presence of our quality manager at the facility; and that "the N-word is accepted as part of the Kane/Rialto culture and is inappropriate".**

Other than your raw allegation, we found no evidence, at all, of use of the "N-word" at the facility – neither during your brief stint there, nor at any time before or since. Specifically, Henry Ortega vehemently denies having *ever* heard that word used at our Rialto facility, including during the week you were there, or that the N-word is part of, or is accepted as part of, the Kane/Rialto culture. Henry just as vehemently denies that you ever brought any such incident to his attention during the week you worked there, or at any time after that. Other Kane-Rialto associates, at all levels, corroborate Henry's account of things there. There is not now and never was a "quality manager" at Kane's Rialto facility, and every other manager or supervisor interviewed there independently stated that he or she had never heard that vile phrase at our Rialto facility. Contrary to the racially hostile and discriminatory workplace you depicted, we found, and were informed by those with whom we spoke, that Rialto has a multi-cultural, collaborative and mutually respectful work environment all around – with a team that works well together, acts appropriately and well with each other, and is inter-reliant and comfortable with each other.

2. **Your allegations that a safety incident occurred when a truck driver moved his truck away from the dock while you were unloading pallets, that you met with Facility Manager Henry Ortega and informed him of that unloading/safety incident as well as your feelings about the use of the "N-word", and that although Henry promised to look into both incidents he never got back to you about them or reported your concerns to H.R., as outlined in corporate policy.**

Henry Ortega vehemently denies that you ever brought either of these alleged incidents to his attention during the week you worked at Rialto, or at any time since. He also denies ever having promised you that he would "get back to you" about them (logical if you never reported them to him) and that of course he did not – and *could not* – discuss with HR something that never occurred, or at least was never brought to his attention. All others interviewed at the facility likewise deny any such incidents, and also deny that you ever spoke with any of them about any incidents or issues there. I note that you did not report any of this to HR until 5 weeks later.

Mr. Ortega also noted that he did not understand how the safety issue you referenced in your communication could even have arisen, since he had not assigned you during your brief period in Rialto to load or unload trailers. Nevertheless, we have reviewed our Rialto safety procedures,

Aaron Sampson
Rialto Investigation – Summary of Findings and Conclusions
July 29, 2016
Page 3 of 3

and have taken steps to hopefully ensure that an incident like you claim happened cannot and will not happen, going forward.

We found this complaint completely unfounded.  There is no corroborating evidence and no basis whatsoever to disbelieve or discredit the credible accounts of Henry Ortega and others working there who consistently deny that the alleged incidents and conversations ever even occurred.

3. **Your allegation that by not investigating the discriminatory and hostile conduct at the facility which you complained about to him, not getting back to you, and not reporting the incidents/your concerns to H.R.) Facility Manager Henry Ortega acted inappropriately, discriminatorily and in violation of corporate policy.**

As noted above, one who has no knowledge of an act, complaint or condition surely cannot act on or respond to it. Henry Ortega, who has shown himself to be ethical, honest and forthright, completely denies the incidents you reported involving or relating to him.  We believe Mr. Ortega (and the others we interviewed at Rialto); we do not credit your account of these things, including Mr. Ortega's conduct, as honest or genuine.  We find this allegation to be completely unfounded.

**If you have any other evidence regarding any of these allegations or wish to designate any other persons you believe can shed light on some or all of them, please provide that evidence and any witness names and contact info (phone numbers, email addresses) as soon as possible, but in any event no later than August 5, 2016.  E-mail is preferred, but if mailed, USPS postmark date will control.**

To sum it up, and as previously noted, we found each of your allegations discussed here to be wholly unsupported, and, frankly, lacking in credibility.  Kane-Is-Able, Inc. is committed to fair treatment of our associates and takes such allegations seriously, as is demonstrated by the intensity and thoroughness of our investigation here.  While we sincerely welcome and will fully protect the rights of any employee to make a bona fide, good faith complaint of inappropriate, wrongful or unlawful workplace conduct, we will not tolerate or protect anyone employed by Kane, at any level – associate, manager or executive, knowingly providing false or intentionally misleading statements, information or allegations.  That is not intended as a charge or accusation, but rather as enlightenment about Kane's (and my) policy on such things.

Thank you.  Please let me know if you have any questions regarding this Memorandum.

Anne E. Cooper,
Senior Vice President, Human Resources

# EXHIBIT H

**Alfonso Yslas**

| | |
|---|---|
| **From:** | Aaron Sampson <teamsampson@yahoo.com> |
| **Sent:** | Friday, June 10, 2016 6:21 AM |
| **To:** | Alfonso Yslas |
| **Cc:** | Anne Cooper |
| **Subject:** | Kane - Discrimination |

Alfonso,

6/8/2016, I met with Don and Floyd in Floyd's office and was told several times that I am not allowed to communicate with Kane H.R. while at the SLC facility. I was also told that Kane H.R. also informed them that I am not allowed to communicate with Kane H.R. while at the SLC facility. Please investigate the following:

Don approached me at my desk and stated that Alfonso and Anne said that they were not expecting anything from me. Both you and Anne were untruthful with your responses.

During the meeting Floyd stated that if I have anything to communicate to Kane H.R. that is not job related, I need to do it outside of work hours and I will be fine". Floyd added that my concerns of discrimination are not specific to my job responsibilities on the floor"

During the meeting I told Floyd and Don that I was communicating with H.R. about concerns of discrimination, which I felt were job related. Floyd responded "it's not", "because that's not part of your job while your hired here".

During the meeting Floyd stated that he spoke to Kane H.R. and was told "if Aaron has anything he wants to forward to us, he needs to "do it on his own time".

During the meeting Floyd stated "while you're here, you should be actively involved in doing the job you were hired for" Floyd added, "So if you have issues with what's going on at work, make note of them, and then you can send an email to H.R., as long as you're not sitting at your desk", doing that kind of stuff, it's not part of your job".

During the meeting Floyd stated "you have a job to do and communicating with Kane H.R. is "not part of your job". I told Floyd and Don that "dealing with discrimination is not part of my job".

During the meeting, Floyd stated that the new break plan, came from a "Journey to zero" message. However, on (6/2/2016) Don told me that "Kane corporate told them to implement the plan" after hearing that I was using the computer at my desk.

During the meeting, I told Floyd and Don that I would prefer to communicate with Kane H.R. via email and Floyd stated "You can do that outside of work". Floyd added, "you have a job here and that's not part of your job"

During the meeting, "I told Floyd and Don that I was communicating with Kane H. R. about discrimination and Floyd told me "it's not specific" to my job responsibilities on the floor.

I feel that Don, Floyd and Kane H.R. are subjecting me to harassment, retaliation and discrimination as a result of my complaints. Please investigate Floyd and Don's comments and let me know your findings.

Best regards,

Aaron L. Sampson

1

# EXHIBIT I

**Alfonso Yslas**

| | |
|---|---|
| **From:** | Aaron Sampson <teamsampson@yahoo.com> |
| **Sent:** | Saturday, June 11, 2016 9:10 AM |
| **To:** | Alfonso Yslas |
| **Cc:** | Anne Cooper |
| **Subject:** | Fw: Kane - Discrimination |

Alfonso,

As a result of the continued harassment, retaliation, and discrimination by Floyd, Don, and Kane H.R., I am notifying you that I officially filed a claim of discrimination with the Utah Anti-discrimination & Labor Division on 6/6/2016, requesting an investigation into the employment discrimination I am experiencing at Kane is Able. As it pertains to your previous email regarding previous claims, in addition to the Utah Anti-Discrimination & Labor Division's investigation, you are expected to fulfill your role as a H.R. Representative and complete your investigation into each and every one of my claims. Again, I will be forwarding additional claims for you to investigate.

Aaron L. Sampson


On Friday, June 10, 2016 7:08 PM, Aaron Sampson <teamsampson@yahoo.com> wrote:


Alfonso,

Floyd and Don stated that Kane H.R. informed them that I am not allowed to sit at my desk and use the company computer system to discuss my concerns of discrimination with the H.R. Department while at the Kane SLC facility. Please provide a copy of the corporate policy that validates your actions. Also, I have additional information regarding harassment and retaliation that I will be forwarding to your attention.

Aaron L. Sampson

On Friday, June 10, 2016 2:48 PM, Alfonso Yslas <alfonso.yslas@kaneisable.com> wrote:

Aaron,

As it pertains to your previous claims, we are working on finalizing what was brought to our attention.

We will look into these new matters but you are still expected to fulfill your role as a Lead.

**Alfonso Yslas ♦ Human Resources Generalist ♦ Kane Is Able ♦** *Dependable People. Exceptional Logistics.*
www.kaneisable.com ♦ (O) 805-983-6602 (C) 805-331-6784 ♦ 601 Kinetic Drive ♦ Oxnard CA 93033

  

1

# EXHIBIT J

**Alfonso Yslas**

| | |
|---|---|
| **From:** | Aaron Sampson <teamsampson@yahoo.com> |
| **Sent:** | Wednesday, June 22, 2016 6:33 AM |
| **To:** | Alfonso Yslas |
| **Cc:** | Anne Cooper |
| **Subject:** | Harassment and retaliation |

Alfonso,

On 6/8/2016, I met with Floyd and Don to discuss Natalja's behavior.  I told them that she does not respond when I greet her and when saying hello as we pass each other throughout the office and warehouse.  I informed them that I felt Natalja was upset because of her involvement with meetings to disuss my concerns of discrimination.  Floyd and Don said they would look into the situation however, Natalja's behavior continues and is unexceptable.  I am requesting an investigation into Natalja's harassment and retaliation.

Aaron L. Sampson

1

KANE000132

# EXHIBIT K

**Alfonso Yslas**

| | |
|---|---|
| **From:** | Aaron Sampson <teamsampson@yahoo.com> |
| **Sent:** | Wednesday, June 29, 2016 5:40 AM |
| **To:** | Alfonso Yslas |
| **Cc:** | Anne Cooper |
| **Subject:** | Discriminatory Treatment |

Alfonso,

During a meeting on 4/20/2016, I informed you and Ann that I was offended by Tony's comment "don't do anything inappropriate" regarding my trip to California.  Anne stated that she heard the comment and told me "Tony is from the east coast and is kind of brass".  I feel that Tony's comments were unprofessional, harassment and retaliation because of my complaints of discrimination.

Aaron L. Sampson

1

# EXHIBIT L

**Alfonso Yslas**

| | |
|---|---|
| **From:** | Aaron Sampson |
| **Sent:** | Wednesday, June 29, 2016 9:41 AM |
| **To:** | Alfonso Yslas |
| **Cc:** | Anne Cooper |
| **Subject:** | Retaliatory Treatment |

Alfonso,

I am experiencing harassment and retaliation from Floyd as a result of my complaints of discriminatory treatment.  Floyd has chosen to respond to my greetings in the morning and when leaving at the end of the day with "yep".  Floyd also no longer speaks and ignores my greetings when walking past each other in the warehouse.  I feel Floyds behavior is retaliatory and harassment because of my complaints to Kane H.R. and the Utah Anti-Discrimination and Labor Division.

**Aaron L Sampson ♦ LTO Lead**
Nutrabolt, SLC ♦ Kane Is Able
1865 South 4490 West Salt Lake City Utah, 84104
*Dependable People. Exceptional Logistics*
801.973.6693



1

# EXHIBIT M

Begin forwarded message:

> **From:** Aaron Sampson <teamsampson@yahoo.com>
> **Date:** August 3, 2016 at 3:03:11 PM EDT
> **To:** Anne Cooper <anne.cooper@kaneisable.com>
> **Cc:** Lorena Wever <lwever@utah.gov>
> **Subject: Re: Investigation:  Improper Entry into and Search of Desks and**
> **Personal Space of Associate and Supervisor; Workplace Harassment**
> **Reply-To:** Aaron Sampson <teamsampson@yahoo.com>

> Anne,

> I am requesting all monies owed to me effective upon my termination of
> employment on July 20, 2016.  I am also requesting that my personal
> belongings (bowl and paper clip holder) left at the Kane SLC facility be sent to
> my home.

> Thank you

> Aaron L. Sampson

> On Wednesday, July 20, 2016 1:19 PM, Anne Cooper <anne.cooper@kaneisable.com>
> wrote:

> Dear Aaron,

> I am sorry that you couldn't come in to meet with me since you called in
> sick today.  As you know, I flew in from Corporate Headquarters in
> Scranton, Pennsylvania for the sole purpose to review the findings of the
> investigation with you regarding improper entry into and the search of
> desks and personal space of an Associate and your Supervisor.

> Because we were unable to meet, I am attaching the investigation results
> to this email in addition to sending it to you via certified mail and 1st Class
> Mail.   The terms and conditions for your return to work are clearly
> specified and include the requirement of your signature to acknowledge
> your understanding of these terms and conditions.

> Regarding your pay today, you have five hours of sick time remaining that
> will be paid.  Normally, you would receive an attendance point since you
> don't have enough time to cover your absence.  I am waiving that
> attendance point.  Your unpaid suspension will be effective tomorrow,
> Thursday, July 21, 2016 with a return to work date of July 28, 2016 at 8:30
> am provided you have signed the attachment and it bring with you.

> Sincerely,

> Anne E. Cooper

2

# EXHIBIT N



**kane**
*is able*

*Dependable People. Exceptional Logistics.*

Internet: www.kanelsable.com          *Post Office Box 931*          Email: info@kanelsable.com
                                      *Scranton, PA  18501-0931*
                                      *800.845.KANE*

July 20, 2016

## MEMORANDUM

~~By Hand-Delivery~~ *Certified, 1st Class mail*

TO:         Aaron Sampson
FROM:       Anne Cooper, Sr. VP, Human Resources
DATE:       July 20, 2016
SUBJECT:    Investigation: Improper Entry into and Search of Desks and Personal Space of
            Associate, Supervisor; Workplace Harassment

Aaron:

We have completed our investigation into allegations that you improperly entered and improperly searched the desks and personal spaces of fellow associate Diane Chacon and your direct supervisor, Donald Maxwell, and find that you acted as alleged with respect to each incident, notwithstanding your denials as to both. We did not find either denial to be credible.

The first incident, in April, was with fellow associate Diane Chacon. Without obtaining or requesting Ms. Chacon's permission, you went to her desk while she was seated there and began searching in her desk drawers for an item (a radio) which you claimed you believed was lost or misplaced. Your action was not pursuant to any general practice at Kane, or between you and Ms. Chacon, nor did she explicitly authorize it that day. Invading another person's private space and personal property is, on its face, workplace behavior that violates Kane's Code of Business Conduct and Business Principles. In this case, your actions were even more egregious because you *continued* to open Ms. Chacon's drawers and invade her personal space and privacy *even after* she told you that the alleged lost or missing item was not in her desk, that her personal belongings were in her drawers and you were not welcome in that personal space, and that she wanted you to stop. *You did not.* Instead, you continued your unwelcome search and intrusion, intensifying Ms. Chacon's concern about the security of her personal belongings. Those actions – particularly continuing to search and intrude after being told to stop – also constitute workplace harassment.

The second incident occurred on May 31, 2016, when you were observed by another associate to be in the private office of your immediate supervisor, DC Quality Supervisor Donald Maxwell, on a day Mr. Maxwell was out, and searching through papers on his desk. You also denied this incident; however, upon interviews of you and the associate who reported the incident, the other associate's account of the incident was determined to be credible; your denial was not. These actions likewise violated Kane's Code of Business Conduct and Business Principles and our General Standards of Conduct on Accountability and Honesty and Integrity. Well beyond that, though, the very notion that

KANE000214

any employee would enter the office of, and rifle through the confidential papers of, one's supervisor without his/her explicit authorization to do so, is completely repugnant to the most fundamental principles of employee conduct and integrity expected in any workplace. Nothing more needs be stated in those regards.

In sum, for all of the reasons cited above, your actions constitute gross misconduct which warrant the most severe disciplinary action, i.e., termination. However, I have determined that since we did not conduct our investigation of these incidents in a time frame more contemporaneous with their occurrence - though for internal administrative reasons which, though understandable, are not preferred (and are now corrected going forward), we will instead impose lesser though substantial discipline and provide you with the opportunity to continue your employment with Kane. This letter, therefore, constitutes your final warning and notification of your last-chance regarding your subject conduct. In addition, you are suspended without pay for one-week, effective immediately and to return on ~~Wednesday~~ (Thursday) July 2ℨ, 2016, at 8:30 a.m. In addition, your "lead" designation (Lead Lift Truck Operator and Safety Champion) is eliminated. Thus, when you return to work on July 2ℨ it will be as 'Lift Truck Operator' at the applicable hourly rate ($13.86 / hr). The remainder of your compensation package upon your return remains as it had been except for any benefits that are a function of specific rate of pay.

Be advised that this final warning and last chance means just that. If you engage in any further conduct that violates Kane's policies or rules, including but not limited to our Code of Business Conduct and Business Principles and/or that breaches customary workplace norms for ethics, integrity or honesty, or if you engage in any further actions that improperly or unlawfully threaten or harass other Kane associates, you will be terminated immediately. Your signature below indicates your receipt of this letter, your acknowledgment of the disciplinary action that has been taken here, and your understanding of what is required and expected of you, going forward. *If there is anything in this letter that you do not understand please advise me immediately and do not sign the letter. Instead, inform me of your question(s) and I will answer you directly so that when you do sign there will no question about your comprehension of the actions taken here and of the conduct expected and required of you, going forward.*

Thank you.

Anne E. Cooper,
Senior Vice President, Human Resources

---

**My signature below confirms that I have received, read and fully understand the above Memorandum, including my one-week disciplinary suspension without pay, final warning and last chance to retain employment with Kane Is Able, Inc.**

_____        _____
Aaron Sampson                            Date

# EXHIBIT O



**Dependable People. Exceptional Logistics.**

Internet: www.kaneisable.com

Post Office Box 931
Scranton, PA 18501-0931
800.845.KANE

Email: info@kaneisable.com

July 29, 2016

**MEMORANDUM**

<u>By Overnight Delivery-Signature Required, and
By 1st Class Mail and E-mail, Receipt Requested</u>

TO:        Aaron Sampson
FROM:      Anne Cooper, Sr. VP, Human Resources
CC:        Floyd Kearl, DC Mgr, Alfonso Yslis, HR Generalist; Megan Augis, HR Mgr
DATE:      July 29, 2016
SUBJECT:   Your Return to Work

Aaron:

You did not report for work as scheduled yesterday.  Absent valid excuse, if you again fail to report for work today and Monday, August 1, you will have terminated your employment with Kane-is-Able, Inc.  If you do report for work on Monday, please make sure to bring with you the last page of my July 20 letter to you, to be signed and dated by you. If for any reason you don't have or can't find that letter, we will, when you come in, reproduce a copy for you to sign.

Please note that in addition to copying Floyd and Alfonso Yslis, I have also copied Megan Augis, a Kane HR Manager based in our home office in Scranton, PA.  Megan was at our Salt Lake facility yesterday, to hold a pre-reinstatement meeting with you to review the terms and conditions of your return and ensure that we are all on the same page.  I would have also participated. With you not showing up, that meeting obviously did not transpire.  Here is Megan's contact information:

    Megan Augis, HR Manager
    Kane Is Able, Inc.
    P.O. Box 931
    Scranton PA 18501
    PH: 570.687.1498; MOBILE: 570.687.1498
    E-mail: megan.augis@kaneisable.com

If you have any questions about this Memorandum, your return to work, or any other issues relating to your employment with Kane, please contact Megan Augis who, as I noted above, is specially assigned to assist you and our Salt Lake City management team with these issues.

Thank you.

Anne E. Cooper,
Senior Vice President, Human Resources

<u>Sampson v. Kane Is Able, Inc.</u>

# EXHIBIT P



Dependable People. Exceptional Logistics.
Post Office Box 931
Scranton, PA  18501-0931
www.kaneisable.com ◆ 800.845.KANE ◆ info@kaneisable.com

August 1, 2016

**By Overnight Delivery-Signature Required, and
By 1st Class Mail and E-mail, Receipt Requested**

Mr. Aaron Sampson
47 Lost Creek Lane #320
Murray, UT 84107

Dear Aaron:

You once again failed to report for work as scheduled today; nor did you call in.  In accordance
with Company policy and practice – and *despite* my prior communications with you in order to
avoid such a result, you have, by your own actions (really *inactions*) – voluntarily terminated
your employment with Kane-is-Able, Inc.

Someone from our HR team will be in touch with you in the next few days to advise you of any
pay you may still be due and of your benefits status, particularly your rights, if any, to continued
health care coverage under COBRA, which would probably be applicable beginning this month
since your last active employment with us was in July.   Once you receive that information, if
you have any questions please contact Megan Augis, HR Manager.  Although I provided her
contact info to you in my last (July 29th) Memo to you, here it is again, for easy reference:

> Megan Augis, HR Manager
> Kane Is Able, Inc.
> P.O. Box 931
> Scranton PA 18501
> PH: 570.687.1498; MOBILE: 570.687.1498
> E-mail: megan.augis@kaneisable.com

I'm sorry you decided to end your employment relationship with Kane in the manner you have,
particularly given the efforts we've made trying to deal effectively and positively with whatever
questions and concerns you expressed while employed here, but I and our Salt Lake City team
wish you well and hope you will succeed in your future ventures.

Sincerely,

Anne E. Cooper,
Senior Vice President, Human Resources