GREGORY W. STEVENS (USB # 7315)
2825 East Cottonwood Parkway
Cottonwood Corporate Center
Suite 500
Salt Lake City, UT 84121-7060
Telephone: (801) 990-3388
Facsimile: (801) 606-7378
Email: utlaw@aol.com
*Attorney for Plaintiff*
*Aaron L. Sampson*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| AARON L. SAMPSON,<br><br>*Plaintiff*,<br><br>v.<br><br>KANE IS ABLE, INC.,<br><br>*Defendant*. | **PLAINTIFF AARON L. SAMPSON'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:17-cv-00947-DN<br><br>Judge David Nuffer |

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED
MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      The Summary Judgment Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      The *McDonnell Douglas* Burden-Shifting Approach . . . . . . . . . . . . . . . . . 27

I.     A JURY COULD REASONABLY CONCLUDE THAT THE
FACTS ESTABLISH A PRIMA FACIE CASE OF UNLAWFUL
RETALIATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

     A.   The Question Whether Mr. Sampson Was Subjected to a
Constructive Termination Presents Genuine Issues of
Material Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

     B.   The Question Whether a Causal Connection Existed Between
Mr. Sampson's Participation in Protected Activity and His
Termination Presents Genuine Issues of Material Fact. . . . . . . . . . 35

II.    A JURY COULD REASONABLY CONCLUDE THAT THE
EVER-CHANGING REASONS PROFFERED BY KANE FOR
MR. SAMPSON'S TERMINATION ARE MERELY PRETEXTUAL. . . 38

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

# TABLE OF AUTHORITIES

*Page*

### Cases

*Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664  (10th Cir. 1998).. . . . . . . . . . . . . 26

*Alexander v. Wal-Mart Stores, Inc.*, Case No. 2:11-cv-752 JCM (PAL),
2013 U.S. Dist. LEXIS 14019  (D. Nev. Feb. 1, 2013).  . . . . . . . . . . . . . . . . . . . . . 4

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).. . . . . . . . . . . . . . . . . . . . 26

*Antonio v. Sygma Network, Inc.,* 458 F.3d 1177  (10th Cir. 2006).  . . . . . . . . . . . 38

*Arizona v. ASARCO, L.L.C.*, 844 F. Supp. 2d 957  (D. Ariz. 2011).. . . . . . . . . . . 3

*Butler v. City of Prairie Village, Kansas,* 172 F.3d 736 (10th Cir. 1999). . . . . . . 39

*Calvert v. Smith's Food & Drug Ctrs., Inc.*, 2007 U.S. Dist. LEXIS 86694,
(D. Utah Nov. 26, 2007) (Stewart, J.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*CBOCS West Inc. v. Humphries*, 553 U.S. 442 (2008).. . . . . . . . . . . . . . . . . . . . 29

*Cockrell v. Boise Cascade Corp.*, 781 F.2d 173 (10th Cir. 1986). . . . . . . . . . . . . 33

*Danville v. Reg'l Lab Corp.*, 292 F.3d 1246 (10th Cir. 2002). . . . . . . . . . . . . 39,40

*Doebele v. Sprint / United Mgt. Co.*, 342 F.3d 1117 (10th Cir. 2003). . . . . . . 40,41

*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir. 2000). . . . . 40

*EEOC v. PVNF, LLC*, 487 F. 3d 790 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . 29

*Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217 (10th Cir. 2008). . . . . . . . . . . . . 28,35

**TABLE OF AUTHORITIES (... continued)**

*Page*

*Gardner v. Deseret Mut. Ben. Adm'rs*, Case No. 2:14-CV-00602-DN,
2016 U.S. Dist. LEXIS 37963 (D. Utah Mar. 22, 2016) (Nuffer, J.). . . . . . . .  26,37

*Garcia v. Pueblo Country Club*, 299 F.3d 123 (10th Cir. 2002). . . . . . . . . . . . . . 27

*Henderson v. Peterson*, Case No. C 07-2838,
2011 U.S. Dist. LEXIS 76799 (N.D. Cal. July 15, 2011). . . . . . . . . . . . . . . . . . .  3,4

*Hertz v. Luzenac America, Inc.*, 370 F.3d 1014 (10th Cir. 2004). . . . . . . . . . . . . . 30

*Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 79
(10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Jackson v. RKO Bottlers of Toledo, Inc.*, 743 F.2d 370 (6th Cir.1984). . . . . . . . . 37

*James v. Sears, Roebuck & Co.*, 21 F.3d 989 (10th Cir. 1994). . . . . . . . . . . . . . . 34

*Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220 (10th Cir. 2000). . . . . . . . . . . 40

*Lints v. Graco Fluid Handling (A) Inc.*, Case No. 2:15-cv-00655-DN,
2018 U.S. Dist. LEXIS 177799 (D. Utah Oct. 15, 2018) (Nuffer, J.). . . . . . . . . . 44

*Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324 (10th Cir.1996),
*cert. denied*, 518 U.S. 1019 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,37

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). . . . . . . . . . . . . .  passim

*McInerney v. United Airlines, Inc.*, 463 Fed. Appx. 709 (10th Cir. 2011). . . . . . 34

*Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545 (10th Cir.),
*cert. denied*, 528 U.S. 813 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**TABLE OF AUTHORITIES (... continued)**

*Page*

*Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164
(10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31,35,41

*Miller v. Auto. Club of N.M., Inc.,* 420 F.3d 1098 (10th Cir. 2005). . . . . . . . . . . . 30

*Morgan v. Hilti, Inc.,* 108 F.3d 1319 (10th Cir. 1997). . . . . . . . . . . . . . . . . . . 39,41

*O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248 (10th Cir. 2001). . . . . . . . . . . . . 31

*Outley v. City of New York*, 837 F.2d 587 (2d Cir. 1988).. . . . . . . . . . . . . . . . . . . 4

*Pastran v. K-Mart Corp.*, 210 F.3d 1201 (10th Cir. 2000).. . . . . . . . . . . . . . . . . 39

*Piercy v. Maketa,* 480 F.3d 1192 (10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . 35

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).. . . . . . . 27,39,41

*Sanchez v. Denver Pub. Schs.,* 164 F.3d 527 (10th Cir. 1998). . . . . . . . . . . . . . . 30

*Seals v. Mitchell*, Case No. CV 04-3764, 2011 U.S. Dist. LEXIS 77865,
(N.D. Cal. April 13, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Spulak v. K Mart Corp.*, 894 F.2d 1150 (10th Cir. 1990).. . . . . . . . . . . . . . . 33,34

*Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254 (1981). . . . . . . . . . 29,31

*United States v. Romero*, 282 F.3d 683 (9th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . 3

*Wright v. City of Topeka, Kan.*, 547 Fed. Appx. 861 (10th Cir. 2013). . . . . . 29,39

**Federal Statutes**

42 U.S.C. § 1981. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*... . . . .  passim

42 U.S.C. § 2000e-3(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Federal Rules of Evidence**

Fed. R. Evid. 403. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## INTRODUCTION

In accordance with Rule 56 of the Federal Rules of Civil Procedure and DUCivR 56-1, Plaintiff Aaron L. Sampson, by and through his undersigned counsel, respectfully submits this Memorandum in opposition to the Motion for Summary Judgment filed by Defendant Kane Is Able, Inc. ("Kane" or "Defendant").[1]  It is clear that there exist genuine issues of material fact that preclude summary judgment on Mr. Sampson's claims under Title VII and Section 1981 that he was subjected to an unlawful retaliatory termination and, accordingly, that Kane's motion should be denied on those claims.[2]

---

[1]  In Count I of his Complaint, Mr. Sampson alleges that Kane subjected him to racially hostile work environment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII").  Complaint ¶¶ 84-88 [Doc. # 2 at 19-20].   In Counts II and IV, Mr. Sampson alleges that Kane subjected him to disparate treatment based on his race, in violation of Title VII and the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").  Complaint ¶¶ 89-95 and 102-08 [Doc. # 2 at 20-21 and 23-24].  In Counts III and V, Mr. Sampson alleges that Kane subjected him to an unlawful retaliatory termination, in violation of Title VII and Section 1981.  Complaint ¶¶ 96-101 and 109-14 [Doc. # 2 at 21-22 and 24-25].

[2]  The purpose of a motion for summary judgment is to narrow the issues for trial.  *E.g., Calvert v. Smith's Food & Drug Ctrs., Inc.*, 2007 U.S. Dist. LEXIS 86694, *17 (D. Utah Nov. 26, 2007) (Stewart, J.).  To help facilitate this goal, Mr. Sampson consents to entry of judgment against him on his claims alleging that he was subjected to a racially hostile work environment and disparate treatment based on his race (Counts I, II and IV of his Complaint).  Mr. Sampson believes that the evidence supports those claims sufficient to survive Kane's Motion.   Nonetheless, (continued...)

-1-

## BACKGROUND

Mr. Sampson, who is African-American, was hired by Kane as a Lead Lift Truck Operator ("Lead LTO") during June 2015.  He performed his job well and, in the only performance evaluation that he received prior to his termination, was given high ratings and praised for his work.  After he started to complain about conduct that he reasonably saw as creating a racially hostile work environment, Kane began to criticize his work.  As Mr. Sampson's complaints became more frequent and intense, Kane's retaliatory actions became more serious.  The retaliatory treatment by Kane reached a head in June 2016 when Mr. Sampson filed his General Intake Questionnaire and then a formal Charge of Discrimination with the Utah Antidiscrimination and Labor Division ("UALD") and let Kane know that he had done so.  In particular, in direct response to Mr. Sampson's having participated in protected activity both by voicing opposition to discriminatory conduct and by participating in the UALD proceeding, Kane engaged in a pattern of retaliatory conduct that culminated in the elimination of his position and reduction in pay.

---

[2](...continued)

Mr. Sampson also recognizes that they are the weaker of the claims, that addressing those claims as distinct causes of action would prove to be a distraction for the jury, and that his retaliation claims will compensate him for his losses resulting from his termination (the most serious injury that he suffered).

Indeed, though Kane attempts to characterize its adverse action against Mr. Sampson as a mere suspension and reassignment, it is clear that the facts would permit a jury to easily, reasonably conclude that he was terminated.  In the end, the record now before the Court would permit a jury to reasonably conclude that Mr. Sampson has established a prima facie case of unlawful retaliation under Title VII and Section 1981 and that the reason proffered by Kane for his termination is merely pretextual.[3]

---

[3]  Kane's reference to prior civil actions brought by Mr. Sampson is nothing more than a spurious diversion from the facts of this case.  Kane's contention that none of those actions resulted in an actual judgment in Mr. Sampson's favor does not tell us anything.  In reality, in each of those cases, Mr. Sampson pursued claims of discriminatory or retaliatory treatment that he reasonably believed were supported by the facts, none of the cases was dismissed as frivolous or fraudulent or on the pleadings, only one case was dismissed on summary judgment, and the remaining cases were all dismissed by stipulation.  Accordingly, evidence of those prior lawsuits is plainly inadmissible.  Under Rule 404(b) of the Federal Rules of Evidence, evidence of litigiousness constitutes inadmissible character evidence.  *Henderson v. Peterson*, Case No. C 07-2838, 2011 U.S. Dist. LEXIS 76799, *15-17 (N.D. Cal. July 15, 2011).  Moreover, even if such evidence were to fall within a permissible purpose under Rule 404(b), which it clearly does not, this Court "must then decide whether the probative value is substantially outweighed by the prejudicial impact under Rule 403."  *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002); *see also* Fed. R. Evid. 403.  Absent a showing that prior actions or claims were fraudulent or frivolous, evidence of Mr. Sampson's prior civil actions is inadmissible under Rule 403 because its minimal probative value, if any, is substantially outweighed by the danger of unfair prejudice to Mr. Sampson, confusing the issues that the jury is called upon to decide, and wasting time by necessitating a mini-trial on the facts at issue in those other cases.  *E.g., Arizona v. ASARCO, L.L.C.*, 844 F. Supp. 2d 957, 968-969 (D. Ariz. 2011) (concluding that evidence of claims of discrimination in response to criticisms of performance in prior employment was inadmissible, because any

(continued...)

## RESPONSE TO DEFENDANT'S STATEMENT
## OF UNDISPUTED MATERIAL FACTS

In accordance with DUCivR 56-1, Mr. Sampson responds to each of the facts set out in Kane's Statement of Undisputed Material Facts as to which a dispute of material fact actually exists:

**Defendant's ¶ 1:**  Kane makes (Motion at p. 2, ¶ 1)[4] the following factual assertion:

> Sampson was brought on as a temporary employee in June 2015, and when that position ended, he was hired as a full-time permanent Lead Lift Truck Operator (LTO), a position that entailed overseeing other lift

---

[3](...continued)
probative value was "substantially outweighed by the potential for prejudice, arising from the possibility that jurors will simply act on the evidence as improper "propensity" evidence and from the potential for a 'mini-trial' over [the employee's] prior employment, distracting the jurors from the issues properly before them"); *Alexander v. Wal-Mart Stores, Inc.*, Case No. 2:11-cv-752 JCM (PAL), 2013 U.S. Dist. LEXIS 14019, *3-5 (D. Nev. Feb. 1, 2013) (granting plaintiff's motion to preclude defendant from presenting evidence of plaintiff's prior slip and fall case against Toys-R-Us) (citing *Henderson*, 2011 U.S. Dist. LEXIS 76799, *16 ("As a general matter, unless the prior lawsuits have been shown to be fraudulent, the probative value of evidence pertaining to a plaintiff's litigation history is substantially outweighed by the danger of jury bias."); *Seals v. Mitchell*, Case No. CV 04-3764, 2011 U.S. Dist. LEXIS 77865, *16 (N.D. Cal. April 13, 2011) ("'A plaintiff's litigiousness may have some slight probative value, but that value is outweighed by the substantial danger of jury bias against the chronic litigant.'") (quoting, in turn, *Outley v. City of New York*, 837 F.2d 587, 592 (2d Cir. 1988)).

[4]  Citations in this form refer to Defendant Kane Is Able, Inc.'s Motion for Summary Judgment filed on November 9, 2018.

-4-

truck (fork lift) operators and generally assuring product is loaded and unloaded onto trucks as needed.

*Response:*  This assertion is inaccurate and incomplete and, therefore, disputed, based on the following facts of record:

A.  During June 2015, Mr. Sampson first started working for Kane through Prologistics, a staffing agency, as a temporary employee in Kane's Salt Lake City, Utah warehouse facility.  While Mr. Sampson occupied that position, Kane set all of the terms and conditions of Mr. Sampson's employment, including his compensation, duties, hire, and termination.[5]

B.  On or about September 21, 2015, after working as a temporary employee, Mr. Sampson was hired as a full-time, permanent employee as the only Lead LTO. After he was hired as a full-time, permanent Lead LTO, Mr. Sampson was the only Lead LTO while he was employed by Kane.[6]

C.  As the Lead LTO, Mr. Sampson was responsible for all of the work in Kane's warehouse in Salt Lake City, Utah that involved equipment operators, including the forklift, "walkie rider," and reach truck.  In that capacity, Mr. Sampson

---

[5]  Pl. Exh. A (Kearl Dep. Tr.) at 18:4-19:22 [Doc. # 26-2 at 6]; Pl. Exh. B (Maxwell Dep. Tr.) at 14:6-13 [Doc. # 26-3 at 5].

[6]  Pl. Exh. A (Kearl Dep. Tr.) at 14:15-19 [Doc. # 26-2 at 5].

was responsible for the equipment operators who performed various functions at the warehouse, including operating reach truck picks, loading and unloading of trucks, and picking of cases for transport.[7]

D.  Floyd Kearl, the Distribution Center Manager for Kane's Salt Lake City facility, testified during his deposition that, in his capacity as Lead LTO, Mr. Sampson had supervisory authority over those employees, including assigning work, training, and ensuring that they complied with Kane's standard operating procedures.[8]

E.  At the time when his position as Lead LTO was later eliminated on July 29, 2016, Mr. Sampson was earning $14.86 per hour.[9]

**Defendant's ¶ 2:**  Kane makes (Motion at pp. 2-3, ¶ 2) the following factual assertion:

The following March, Sampson received an Associate Counseling Report (ACR) – a form of written discipline – because he committed a shipping error, an associate for whom he was responsible as Lead LTO committed a second error, and more generally, Sampson's supervisor

---

[7]  Pl. Exh. A (Kearl Dep. Tr.) at 6:8-22 [Doc. # 26-2 at 3]; Pl. Exh. C (advertisement for position of lead forklift operator) [Doc. # 26-4]; and Pl. Exh. D (position description for lead forklift operator) [Doc. # 26-5].

[8]  Pl. Exh. A (Kearl Dep. Tr.) at 5:9-17; 9:14-10:3 [Doc. # 26-2 at 3].

[9]  Pl. Exh. E (pay advice statement dated June 3, 2016) [Doc. # 26-6 at 2].

believed that "[a]fter extensive training during the past 9 months Aaron ha[d] yet to pick up on general warehouse processes."

*Response:*   This assertion is inaccurate and misleading and, accordingly, disputed, as shown by the following facts of record:

A.   The issue to which Kane refers in the Associate Counseling Report ("ACR") and Improvement Plan did not play a role in the decision to suspend Mr. Sampson and eliminate his position.[10]

B.   The ACR noted by Kane in the foregoing factual assertion was also removed from Mr. Sampson's record.[11]

C.   Don Maxwell was the Quality Manager at Kane's Salt Lake City facility while Mr. Sampson was employed there; Mr. Maxwell was responsible for the day-to-day operation of the facility and supervised Mr. Sampson; and Mr. Maxwell was supervised by Mr. Kearl.[12]

D.   Mr. Maxwell testified during his deposition that an ACR is a coaching tool, used to help coach an employee so that he or she understands their job

---

[10]  Def. Sub-Exh. N (Memorandum from A. Cooper, Sr. VP, Human Resources, to A. Sampson dated July 20, 2016) at 2 [Doc. # 23-3 at 63] to Def. Exh. 2 (Cooper Decl.); Pl. Exh. F (Cooper Dep. Tr.) at 8:13-22 [Doc. # 26-7 at 6].

[11]  Pl. Exh. F (Cooper Dep. Tr.) at 16:16-17:2 [Doc. # 26-7 at 6].

[12]  Pl. Exh. B (Maxwell Dep. Tr.) at 3:12-4:1 [Doc. # 26-3 at 2].

responsibilities, not a disciplinary action.  Disciplinary actions would include a written warning, suspension, and termination.[13]

E.  By contrast, Mr. Kearl states in his Declaration filed by Kane in support of its Motion for Summary Judgment that an ACR is a form of written discipline and that it is given for more serious errors.[14]

F.  The timing and validity of the ACR given to Mr. Sampson on March 28, 2018 renders it unworthy of credence, in light of the following facts of record:

1.  Kane first evaluated Mr. Sampson's performance while he was a temporary employee, in a 45-day review, on June 26, 2015.  In that review, Kane stated, as its "outlook" for Mr. Sampson, "Progress on track.  Keep up the good work."[15]  As noted above, Mr. Sampson was then hired as the permanent Lead LTO.

---

[13]  Pl. Exh. B (Maxwell Dep. Tr.) at 7:18-25; 24:3-25:3 [Doc. # 26-3 at 3, 7-11].

[14]  Def. Exh. 1 (Kearl Decl.) ¶ 17 [Doc. # 23-2 at 4].

[15]  Pl. Exh. G (45-Day Review) at 1-2 [Doc. # 26-8 at 2-3]; Pl. Exh. A (Kearl Dep. Tr.) at 18:2-7 [Doc. # 26-2 at 6].

2.   During October 2015, well after then being hired as the Lead LTO, Mr. Sampson was put on "Succession Plan" that addressed what he needed to accomplish in order to advance within Kane.[16]

3.   Mr. Sampson next received an annual Performance Review on March 28, 2016.  In that  Performance Review, Kane gave Mr. Sampson an overall rating of "good" and ratings of "good" to "excellent" in each of the categories that included productivity (good), accuracy (good), conduct (good), attendance (excellent), innovation (good), and safety (excellent).[17]

4.   In the "Manager Comments" set out in that Performance Review given on March 28, 2016, Kane wrote, "Aaron has the abilities to support our team in a successful relationship with our customer.  He is a valuable member of our leadership team and contributes to the success to the business here in SLC."[18]

5. In the "Overall Comments" set out in that Performance Review given on March 28, 2016, Kane wrote, "Floyd's comments:  Aaron continues to excel with

---

[16]   Def. Exh. 1 (Kearl Decl.) ¶¶ 11, 13 [Doc. # 23-2 at 4] and Def. Sub-Exh. A (Succession Plan) to Def. Exh. 1 (Kearl Decl).

[17]   Pl. Exh. H (Performance Review) at 1-3 [Doc. # 26-9 at 2-4]; see also Pl. Exh. A (Kearl Dep. Tr.) at 17:1-25 [Doc. # 26-2 at 6].

[18]   Pl. Exh. H (Performance Review) at 2 [Doc. # 26-9 at 3].

understanding the business and his role at our site.  I fully expect this time next year he will be well progressed beyond his current role as the MHF Lead.  Aaron currently is working on a succession plan."[19]

6.   The verbal counseling reflected in the ACR and Improvement Plan to which Kane refers in the factual assertion quoted above is dated March 23, 2016.[20] There was no mention of the issue raised in the March 23, 2016 ACR in Mr. Sampson's Performance Evaluation given to him on March 28, 2016 or in the discussion of that evaluation with him on that date.[21]

7.   The verbal counseling reflected in the ACR dated March 23, 2016 was given to Mr. Sampson on March 28, 2016, after he had received his Performance Evaluation, later the same day.  During the Performance Evaluation, Mr. Maxwell and Mr. Kearl told Mr. Sampson that he was doing a "fantastic job."  Within two hours

---

[19]   Pl. Exh. H (Performance Review) at 2 [Doc. # 26-9 at 3].

[20]   Def. Sub-Exh. C (ACR and Improvement Plan given to Mr. Sampson on March 28, 2016 for events that occurred on March 23, 2016) [Doc. # 23-2 at 4-14] to Def. Exh. 1 (Kearl Decl.).

[21]   Pl. Exh. A (Kearl Dep. Tr.) at 28:13-29:10 [Doc. # 26-2 at 8].

of the meeting, Mr. Maxwell and Mr. Kearl met with Mr. Sampson and told him that

he was receiving a "verbal reprimand" for "poor performance on the job."[22]

**Defendant's ¶ 3:**  Kane makes (Motion at p. 3, ¶ 3) the following factual

assertion:

> In April, Sampson emailed HR requesting an investigation into an array
> of alleges [sic.] instances of discrimination spanning the previous ten
> months.

*Response:*  This assertion is incomplete and gives a false impression, and, as

a consequence, is disputed, based on the following facts of record:

A.  During November 2015, Mr. Sampson made his first complaints, internally

with Kane, that he had been subjected to a racially hostile work environment.[23]

B.   Mr. Sampson's complaints about being subjected to discriminatory

treatment intensified beginning in 2016.  Beginning in April 2016, having received

no remedial action being taken by Mr. Kearl or Mr. Maxwell, Mr. Sampson

complained to Kane's Human Resource's Department about Mr. Kearl's failure to

reprimand associates for having made racially derogatory comments, fabrication of

information about Mr. Sampson, having made inappropriate jokes, subjecting

---

[22]  Def. Sub-Exh. A (Email from A. Sampson to A. Cooper, Sr. VP, Human
Resources, dated Apr. 14, 2016) [Doc. # 23-3 at 6-7] to Def. Exh. 2 (Cooper Decl.).

[23]  Def. Exh. 8 (Sampson Dep. Tr.) at 35:1-12 [Doc. # 23-9 at 34].

Mr. Sampson to disparate treatment, and failing to reprimand other associates for violations of company policy.[24]

C.  During June 2016, Mr. Sampson's internal complaints to Anne Cooper, Kane's Senior Vice President of Human Resources, about what he saw as discriminatory treatment intensified even more, as Ms. Cooper states in her Declaration filed by Kane in support of its Motion.[25]

D.  During 2016, Mr. Sampson also made a complaint to Alfonso Yslas, Human Resources Manager at Kane, concerning the imposition of a break policy during June 2016 that required employees to take their breaks in the break room and prohibited employees from taking breaks at their desks and, in so doing, prevented Mr. Sampson from communicating with Human Resources during his break, while allowing other employees to not adhere to the policy.[26]

---

[24]  Def. Exh. 2 (Cooper Decl.) ¶¶ 16-21 [Doc. # 23-3 at 4];  Def. Exh. 8 (Sampson Dep. Tr.) at 42:10-44:12 [Doc. # 23-9 at 12].

[25]  Def. Exh. 2 (Cooper Decl.) ¶¶ 2, 3, 7, 8 [Doc. # 23-3 at 3]; *see also*  Def. Sub-Exh. A (Email from A. Sampson to A. Cooper, Sr. VP, Human Resources, dated Apr. 14, 2016) [Doc. # 23-3 at 6-7] to Def. Exh. 2 (Cooper Decl.).

[26]  Pl. Exh. I (Email from A. Sampson to A. Yslas, sent June 2016) [Doc. # 26-10].

E.  Also during June 2016, Mr. Sampson then submitted a written, internal complaint that identified the specific, racially discriminatory and retaliatory treatment to which he believed that he had been subjected since the start of his employment as a permanent employee with Kane.[27]

F.  Also during June 2016, Mr. Sampson believed that he was not receiving any actual remedial action in response to his internal complaints with Kane and, accordingly, sought relief through the administrative process with the UALD.  On or about June 7, 2016, Mr. Sampson submitted his Intake Questionnaire with UALD.[28]

G.  On or about June 8, 2016, Mr. Sampson notified Kane that he had started the administrative process with the UALD.[29]

---

[27]  Pl. Exh. J (A. Sampson, Internal Complaint, June 2016) [Doc. No. 26-11].

[28]  Pl. Exh. K (UALD General Intake Questionnaire stamped as "received" by the UALD on June 8, 2016) [Doc. # 26-12].

[29]  Def. Exh. 10 (audio recording of June 8, 2016 conversation with D. Maxwell; stating that "I have filed a claim with the State of Utah and EEOC") [Doc. # 25].

H.  On June 11, 2016, Mr. Sampson followed up with an email to Ms. Cooper, in which Mr. Sampson stated that "I am notifying you that I officially filed a claim with the Utah Anti-Discrimination and Labor Division on 6/6/2016."[30]

I.  After the UALD prepared a formal Charge of Discrimination, Mr. Sampson signed the Charge and submitted it to the UALD on June 28, 2016.[31]

J.  During the morning of June 28, 2016, when Mr. Sampson had submitted his Charge of Discrimination to the UALD, he informed Mr. Maxwell that he had done so.[32]

K.  On July 6, 2016, Mr. Maxwell received from the UALD the Notice of Charge of Discrimination, Charge of Discrimination, cover letter, and additional documents.[33]

---

[30]  Def. Sub-Exh. I (Email from A. Sampson to A. Cooper, VP, Human Resources, dated June 11, 2016) [Doc. # 23-3 at 52] to Def. Exh. 2 (Cooper Decl.).

[31]  Pl. Exh. L (UALD Charge of Discrimination stamped as "received" on June 28, 2016) [Doc. # 26-13].

[32]  Def. Exh. 8 (Sampson Dep. Tr.) at 213:14-22 [Doc. # 23-9 at 55].

[33]  Pl. Exh. M (Certified Mail Confirmation of Receipt, Notice of Charge, Charge, and related documents, July 6, 2016) [Doc. # 26-14].

**Defendant's ¶ 4:**  Kane makes (Motion at p. 3, ¶ 4) the following factual assertion:

Kane subsequently conducted an investigation and issued a report.

*Response:*  This assertion is inaccurate and incomplete and, accordingly, is disputed, based on the following facts of record:

A.  Kane did not issue its "report" of the investigation, ostensibly conducted by Ms. Cooper until July 29, 2016, after Kane had suspended Mr. Sampson and eliminated his position.[34]

B.  Kane's Human Resources Department did not discuss Mr. Sampson's complaints that he had been subjected to a racially hostile work environment or disparate treatment based on his race with Mr. Kearl, the Distribution Center Manager for Kane's Salt Lake City facility.[35]

---

[34] Def. Sub-Exh. G (Memorandum from A. Cooper, Sr. VP, Human Resources, to A. Sampson, dated July 29, 2016) at 1-3 [Doc. # 23-3 at 46-48] to Def. Exh. 2 (Cooper Decl.); Pl. Exh. F (Cooper Dep. Tr.) at 6:15-10 [Doc. # 26-7 at 4].

[35] Pl. Exh. A (Kearl Dep. Tr.) at 15:11-16:24 [Doc. # 26-2 at 5].

-15-

C.  Mr. Maxwell likewise testified during his deposition that he was aware only that Mr. Sampson had been suspended and not of his allegations of discriminatory treatment.[36]

**Defendant's ¶ 5**:  Kane makes (Motion at p. 3, ¶ 5) the following factual assertion:

On June 28, Sampson received a second ACR for two more shipping errors.

*Response:*  This assertion is incomplete and, as a result, inaccurate, as shown by the following facts of record:

A.  The issue to which Kane refers in the ACR did not play a role in the decision to suspend Mr. Sampson and eliminate his position.[37]

B.  Mr. Sampson received the second ACR and Improvement Plan from Mr. Maxwell during the afternoon of June 28, 2016 for shipping errors that occurred on June 23, 2016 and June 24, 2016 – after he had, that same morning on June 28,

---

[36]  Pl. Exh. B (Maxwell Dep. Tr.) at 11:24-12:14 [Doc. # 26-3 at 4].

[37]  Def. Sub-Exh. N (Memorandum from A. Cooper, Sr. VP, Human Resources, to A. Sampson dated July 20, 2016) at 2 [Doc. # 23-3 at 63] to Def. Exh. 2 (Cooper Decl.); Pl. Exh. F (Cooper Dep. Tr.) at 8:13-22 [Doc. # 26-7 at 4].

2016, informed Mr. Maxwell that he had filed a Charge of Discrimination with the UALD.[38]

**Defendant's ¶ 6:**  Kane makes (Motion at p. 3, ¶ 6) the following factual assertion:

> Around this time, one of Sampson's colleagues reported that Sampson went through her desk without her permission, and another colleague reported witnessing Sampson go through his supervisor's desk without permission.

*Response:*   This assertion is incomplete, inaccurate, and leaves a false impression and, as a result, is disputed, based on the following facts of record:

A.  The first incident in which Mr. Sampson was alleged to have gone through the desk of a coworker, Diane Chacon, occurred during April 2016 when he allegedly went through her desk in his presence.[39]

B.   Ms. Chacon testified during her deposition that she first reported the incident to Natalja Schonle in April 2016; and, in June 2016, not that she reported the incident to Human Resources but instead that she was asked by Alfonso Yslas of

---

[38] Def. Exh. 8 (Sampson Dep. Tr.) at 213:14-22 [Doc. # 23-9 at 55]; Def. Sub-Exh. F (ACR signed by D. Maxwell on June 28, 2016) [Doc. # 23-2 at 30-31] to Def. Exh. 1 (Kearl Decl.).

[39] Def. Exh. 5 (Chacon Decl.) ¶ 2 [Doc. # 23-6 at 3]; Def. Sub-Exh. N (Memorandum from A. Cooper, Sr. VP, Human Resources, to A. Sampson dated July 20, 2016) at 2 [Doc. # 23-3 at 63] to Def. Exh. 2 (Cooper Decl.).

Kane's Human Resources Department to write a report about the incident and then send him an email about it.  She did so.[40]

C.  By contrast, Mr. Yslas states in his Declaration that, "[i]n June 2016, two Kane associates reported to Kane that they had witnessed Sampson going through other Kane employees' desks without permission."[41]

D.  The second incident in which Mr. Sampson was alleged by another employee, Natalja Schonle, to have gone through the desk of  another employee, Mr. Maxwell, occurred on or about May 31, 2016.[42]

E.  Ms. Schonle states in her Declaration filed by Kane in support of its Motion for Summary Judgment that she witnessed the incident on May 31, 2016 and reported it to Mr. Maxwell the next day, June 1, 2016.[43]  Like Ms. Chacon, Ms. Schonle

---

[40] Pl. Exh. O (Chacon Dep. Tr.) at 6:2-21; 8:24-9:4 [Doc. # 26-16 at 5 and 6]; see also Def. Exh. 5 (Chacon Decl.) ¶¶ 6-7 [Doc. # 23-6 at 3]; and Def. Sub-Exh. A (handwritten statement dated June 16, 2016) [Doc. # 23-6 at 5] to Def. Exh. 5 (Chacon Decl.).

[41] Def. Exh. 4 (Yslas Decl.) ¶ 2 [Doc. # 23-5 at 4].

[42]  Def. Exh. 6 (Schonle Decl.) ¶ 2 [Doc. # 23-7 at 3]; and  Pl. Exh. A (Kearl Dep. Tr.) at 30:16-21 [Doc. # 26-2 at 9]; Def. Sub-Exh. N (Memorandum from A. Cooper, Sr. VP, Human Resources, to A. Sampson dated July 20, 2016) at 1-2 [Doc. # 23-3 at 62-63] to Def. Exh. 2 (Cooper Decl.).

[43] Def. Exh. 6 (Schonle Decl.) ¶¶ 2-3 [Doc. # 23-7 at 3].

likewise never provided a written statement to Kane until June 16, 2016 when she provided one to Ms. Ysalas of Kane's Human Resources Department.[44]

F.   Neither of those incidents was brought to the attention of Mr. Kearl, the Distribution Center Manager, around the time that they occurred.[45]   Mr. Kearl testified during his deposition that he learned about those allegations, during May or June 2016, from Mr. Maxwell.[46]

G.   Mr. Maxwell's testimony, in turn, conflicts with the testimony of Ms. Chacon, Ms. Schonle and Mr. Kearl.  Mr. Maxwell testified during his deposition that he did not learn about the allegations that Mr. Sampson had gone through his desk and Ms. Chacon's desk until after he had returned from vacation and was told about the allegations by Mr. Kearl and Ms. Cooper.[47]

H.   Although the incidents were, according to Kane, serious enough to terminate Mr. Sampson from his position as Lead LTO, Mr. Maxwell thus did not

---

[44]   Def. Exh. 6 (Schonle Decl.) ¶ 5 [Doc. # 23-7 at 3] and Def. Sub-Exh. A (statement dated June 16, 2016)  [Doc. # 23-7 at 5] to Def. Exh. 6 (Schonle Decl.).

[45]   Pl. Exh. A (Kearl Dep. Tr.) at 30:2-25 [Doc. # 26-2 at 9].

[46]   Pl. Exh. A (Kearl Dep. Tr.) at 29:18-30:1 [Doc. # 26-2 at 9].

[47]   Pl. Exh. B (Maxwell Dep. Tr.) at 16:8-23 [Doc. # 26-2 at 5].

take any action himself and never reported the incidents to Kane's Human Resources Department for further action even though he knew about them.[48]

**Defendant's ¶ 7:**  Kane makes (Motion at p. 3, ¶ 7) the following factual assertion:

> Sampson was suspended with pay while Kane investigated the allegations.

*Response:* Although Mr. Sampson does not dispute the assertion that he was suspended with pay before his position was later eliminated and he was suspended without pay, there appears to be some confusion by Mr. Kearl, the Distribution Center Manager, about whether he was suspended with or without pay, as reflected by the following facts of record:

A.  Mr. Kearl testified during his deposition that he was suspended with pay and not without pay.[49]

---

[48]  Pl. Exh. B (Maxwell Dep. Tr.) at 16:8-23 [Doc. # 26-3 at 5]; Def. Exh. 6 (Schonle Decl.) ¶¶ 2-3 [Doc. # 23-7 at 3].

[49]  Pl. Exh. A (Kearl Dep. Tr.) at 27:10-18 [Doc. # 26-2 at 8].

B.  By contrast, in his Declaration filed by Kane in support of its Motion here in support of its Motion, Mr. Kearl states that Mr. Sampson "was suspended without pay in July 2016" without mention of his having been suspended with pay.[50]

**Defendant's ¶ 8:**  Kane makes (Motion at p. 3, ¶ 8) the following factual assertion:

> After investigating, Kane substantiated that Sampson had gone through the desks of a coworker and supervisor without permission, and Kane consequently suspended Sampson for one week without pay and removed his lead position.

*Response:*   This assertion is inaccurate and paints a false picture and, accordingly, is disputed, based on the following facts of record:

A.  The first effort to address the allegations that Mr. Sampson had gone through the desks of other employees during April and May 2016 occurred on June 30, 2016, when – two days after Mr. Sampson had informed Mr. Maxwell that he had filed a Charge of Discrimination with the UALD – Mr. Yslas and Mr. Kearl met with Mr. Sampson.[51]

---

[50]  Def. Exh. 1 (Kearl Decl.) ¶ 37 [Doc. # 23-2 at 7].

[51]  Pl. Exh. F (Cooper Dep. Tr.) at 11:6-12:16 [Doc. # 26-7 at 5].

B.  While Mr. Kearl has been employed by Kane and prior to Mr. Sampson's suspension, no other employee at the Salt Lake City facility had ever been suspended.[52]

**Defendant's ¶ 9:**  Kane makes (Motion at p. 4, ¶ 9) the following factual assertion:

> When his one-week suspension was up, Sampson did not return to work, and Kane warned Sampson if he didn't show up to work the following Monday, he would be considered to have voluntarily terminated.

*Response:*  The implied assertion that Mr. Sampson terminated his position voluntarily is inaccurate and, accordingly, disputed, based on the following facts of record:

A.  When Kane suspended Mr. Sampson, it also eliminated his position and, in so doing, took away his supervisory responsibilities.[53]

B.   Kane has made conflicting assertions as to why Kane eliminated Mr. Sampson's position, as reflected in the following evidence of record:

1.  Mr. Kearl testified that Kane eliminated the position not as a disciplinary action against Mr. Sampson but instead because there was no longer a

---

[52]  Pl. Exh. A (Kearl Dep. Tr.) at 34:14-22 [Doc. # 26-2 at 10].

[53]  Pl. Exh. A (Kearl Dep. Tr.) at 27:19-20 [Doc. # 26-2 at 8].

need for the position.[54]  Mr. Kearl repeats this assertion in his Declaration filed by Kane in support of its Motion.[55]

      2.  Mr. Maxwell likewise testified during his deposition that the position was eliminated not as a disciplinary action taken against Mr. Sampson but because there was no need for the position based on the number of workers.[56]

      3.  By contrast, in the July 20, 2016 Memorandum from Ms. Cooper to Mr. Sampson, Ms. Cooper wrote that, in addition to suspending him without pay, "your 'lead' designation (Lead Life Truck Operator and Safety Champion) is eliminated," and that, "[w]hen you return to work on July 28 it will be as 'Lift Truck Operator' at the applicable hourly rate ($13.86 / hr.)."[57]

    C.  Likewise, in its submission to the UALD dated November 7, 2016, Kane asserted that, "[o]n July 20, 2016, Kane disciplined Sampson for his conduct."  Kane stated:

---

[54] Pl. Exh. A (Kearl Dep. Tr.) at 27:22-28:12 [Doc. # 26-2 at 8].

[55] Def. Exh. 1 (Kearl Decl.) ¶ 37 [Doc. # 23-2 at 7].

[56] Pl. Exh. B (Maxwell Dep. Tr.) at 17:2-14 [Doc. # 26-3 at 6].

[57] Def. Sub-Exh. N (Memorandum from A. Cooper, Sr. VP, Human Resources, to A. Sampson dated July 20, 2016) at 2 [Doc. # 23-3 at 63] to Def. Exh. 2 (Cooper Decl.); Pl. Exh. F (Cooper Dep. Tr.) at 8:13-22 [Doc. # 26-7 at 4].

Although an investigation into the matter concluded that Sampson had engaged in gross misconduct, which warranted immediate termination, Kane did not terminate Sampson. Instead, because the investigation was not contemporaneous with when the conduct occurred, Kane imposed a lesser discipline, which included a last chance warning and notification due to his conduct, one-week suspension without pay and elimination of his "lead" designation so that his new title was Lift Truck Operator at the applicable rate of $13.68 an hour.[58]

D.   Kane later claims in the Argument portion of its Motion (at 18) that Mr. Sampson's position was eliminated both because the position was no longer needed and because Mr. Sampson was not qualified for the position. Yet, as the record cited above makes clear, Kane had asserted before the UALD that the position was eliminated as part of the disciplinary action taken against Mr. Sampson and not for some other reason. In fact, as the record cited above also makes clear, neither Mr. Kearl nor Mr. Maxwell ever asserted that the position was eliminated because Mr. Sampson was not qualified for it, until now. Kane has thus now asserted three different reasons for eliminating Mr. Sampson's position, while, at first, there was only one.

---

[58] Pl. Exh. N (Letter from K. Toth, Esquire, to J. Jeppson, Investigator, UALD, dated Nov. 7, 2016) at 2 [Doc. # 26-15 at 3]; Pl. Exh. F (Cooper Dep. Tr.) at 8:23-10:7 [Doc. # 26-7 at 4].

-24-

E.  When Kane eliminated Mr. Sampson's position and informed him that he could work for Kane as a Lift Truck Operator, Kane also thus reduced Mr. Sampson's compensation from $14.86 per hour to $13.68 per hour.[59]

**Defendant's ¶ 10:**  Kane makes (Motion at p. 4, ¶ 10) the following factual assertion:

> Sampson did not show up, and Kane informed him he had voluntarily terminated his employment.

*Response:*   This implied assertion that Mr. Sampson had terminated his employment voluntarily is inaccurate and, accordingly, disputed, based on the facts of record cited in response to Defendant's Paragraph 9 above.

---

[59]  Def. Exh. 8 (Sampson Dep. Tr.) at 51:17-25 [Doc. # 23-9 at 14]; Pl. Exh. E (pay advice statement dated June 3, 2016) [Doc. # 26-6 at 2]; Pl. Exh. N (Letter from K. Toth, Esquire, to J. Jeppson, Investigator, UALD, dated Nov. 7, 2016) at 2 [Doc. # 26-15 at 3]; Pl. Exh. F (Cooper Dep. Tr.) at 8:23-10:7 [Doc. # 26-7 at 4]; see also Defendant's Motion (at 17-18).

-25-

# ARGUMENT

## MR. SAMPSON'S CLAIMS THAT HE WAS SUBJECTED TO AN UNLAWFUL RETALIATORY TERMINATION PRESENT GENUINE ISSUES OF MATERIAL FACT

### The Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper only when the record, viewed in a light most favorable to the nonmoving party, shows that there is no genuine issue of material fact.[60]   A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[61]   In determining whether there is a genuine dispute as to material fact, the district court is called upon to "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[62]

"'The trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact

---

[60]  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

[61]  *Gardner v. Deseret Mut. Ben. Adm'rs*, Case No. 2:14-CV-00602-DN, 2016 U.S. Dist. LEXIS 37963, *34 (D. Utah Mar. 22, 2016) (Nuffer, J.) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[62]  *Id.*

to be tried, not to deciding them.'"[63]  Thus, the trial court must disregard all evidence favorable to the moving party that the jury is not required to believe.[64]  Finally, in cases like this one, where credibility is the issue, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the Defendants' true state of mind."[65]

## The *McDonnell Douglas* Burden-Shifting Approach

Kane contends (Motion at 20) that Mr. Sampson has alleged fourteen instances of retaliation and then attempts (id. at 20-39) to address each of those fourteen instances.  Yet, Kane seems to be confused about the nature of Mr. Sampson's actual causes of action.  In the first paragraph of his Complaint, Mr. Sampson states that this civil action states claims for damages caused by Kane's violations Title VII and Section 1981 for the termination of his employment in retaliation for his having

---

[63]  *Garcia v. Pueblo Country Club*, 299 F.3d 1233, 1239 (10th Cir. 2002) (citation omitted).

[64]  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151-52 (2000).

[65]  *Randle v. City of Aurora*, 69 F.3d 441, 455 (10th Cir. 1995); *see also Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 551 (10th Cir.) ("The jury … has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact.") (quotation omitted), *cert. denied*, 528 U.S. 813 (1999).

-27-

engaged in protected activity.[66]  Then, in Count III of his Complaint, Mr. Sampson alleges that Kane violated Title VII for having terminated him in retaliation for his having engaged in protected activity.[67]  Likewise, in Count V of his Complaint, Mr. Sampson alleges that Kane violated Section 1981 for having terminated him in retaliation for his having engaged in protected activity.[68]  Thus, though each of the instances of alleged retaliatory conduct that Kane addresses in its Motion may constitute evidence of conduct that ultimately supports his claim for retaliatory termination, his claims alleging unlawful retaliation are limited to his termination.

When, as here, there is an absence of direct evidence reflecting retaliatory animus,[69] the burden-shifting analysis set forth in *McDonnell Douglas*[70] under Title

---

[66]  Complaint ¶ 1 [Doc. # 2 at 2].

[67]  Id. ¶¶ 96-101 [Doc. # 2 at 21-22].

[68]  Id. ¶¶ 109-114 [Doc. # 2 at 114].

[69]  To prevail on a claim alleging a retaliatory termination in violation of Title VII and Section 1981, a plaintiff may establish that retaliation played a part in the employment decision in two ways:  under what is often characterized as the "mixed-motive" analysis, which requires evidence that retaliatory animus played a motivating part in the employment decision; or, alternatively, by application of the shifting-burden analysis set forth in *McDonnell Douglas*. *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224-25 (10th Cir. 2008) (quotation omitted).

[70]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 804 (1973).

VII and Section 1981.[71]  Under the *McDonnell Douglas* analysis, a plaintiff bears the initial burden of setting forth a prima facie case of retaliation.  After the plaintiff makes a prima facie case, the burden shifts to the employer to give a legitimate, non-retaliatory reason for its employment decision. [72] Establishing a prima facie case narrows the "inquiry into the *elusive factual question of intentional [retaliation]*" by "in effect creat[ing] a presumption that the employer unlawfully [retaliated] against the employee," which thereby compels the employer to respond with a nondiscriminatory explanation for its decision.[73]  If the employer comes forward with a non-retaliatory reason for its actions, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual – unworthy of belief.[74]

---

[71]  *E.g., Wright v. City of Topeka, Kan.*, 547 Fed. Appx. 861, 863 (10th Cir. 2013).  Under 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by [Title VII]." In addition, the United States Supreme Court has likewise held that 42 U.S.C. § 1981 encompasses claims of retaliation. *CBOCS West Inc. v. Humphries*, 553 U.S. 442, 456-57 (2008).

[72]  *EEOC v. PVNF, LLC*, 487 F. 3d 790, 804 (10th Cir. 2007).

[73]  *Tex. Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 255 n. 8 (1981).

[74]  *Id.* (citations omitted).

In light of these principles, it is clear that a reasonable jury could conclude that Mr. Sampson was subjected to an unlawful, retaliatory termination. Kane, for its part, contends (Motion at 35-37) that Mr. Sampson cannot establish a prima facie case that he was terminated in retaliation for having engaged in protected activity; and that, even if he were able to do so, he cannot establish that the reasons proffered by Kane for his termination were pretextual. Kane is wrong on both points.

## I.   A JURY COULD REASONABLY CONCLUDE THAT THE FACTS ESTABLISH A PRIMA FACIE CASE OF UNLAWFUL RETALIATION.

To establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he or she engaged in protected opposition to discriminatory conduct or participated in a proceeding established to address claims of unlawful discrimination,[75] (2) a reasonable employee would have found the challenged action materially adverse, and (3) there exists a causal connection between the protected activity and the materially adverse action.[76] The Supreme Court and the Tenth Circuit

---

[75] The Tenth Circuit has made clear that "[a] meritorious retaliation claim will stand even if the underlying discrimination claim fails." *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 533 (10th Cir. 1998). The Tenth Circuit has also made clear that "[p]rotected opposition can range from filing formal charges to voicing informal complaints to superiors." *Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

[76] *E.g., Miller v. Auto. Club of N.M., Inc.,* 420 F.3d 1098, 1119 (10th Cir. (continued...)

-30-

have made clear that establishing a prima facie case is not an onerous burden.[77] "The 'critical inquiry' at this prima facie stage is whether the plaintiff has demonstrated that the employer's action occurred under circumstances which give rise to an inference of unlawful [retaliation]."[78]

Kane contends (Motion at 35-37) that Mr. Sampson cannot establish a prima facie case of unlawful retaliation. In support of contention, the Defendant first asserts (id. at 38) that Mr. Sampson was only suspended and not terminated and that the facts do not support the conclusion that he was constructively terminated.[79] The Defendant

---

[76](...continued)
2005); *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1252 (10th Cir. 2001).

[77] *E.g., Burdine*, 450 U.S. at 255.

[78] *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (internal quotations omitted).

[79] Kane also asserts (Motion at 17 and 38) that Mr. Sampson does not allege in his Complaint that he was subjected to a constructive discharge. Yet, as Kane also acknowledges (id. at 17 n. 69), Mr. Sampson actually sets out the elements of a claim for constructive discharge. In particular, Mr. Sampson alleges the following:

72.   On July 20, 2016, Kane suspended Mr. Sampson without pay, eliminated the Lead LTO position, terminated him from his position as the Lead LTO, demoted him to the position of Lift Truck Operator ("LTO"), and would have paid him $1.00 / hour less in the new position.

73.   As a result of the continued discriminatory and retaliatory treatment by Kane, with no resolution having been achieved or attempted in good

(continued...)

-31-

also asserts (id. at 35-37) that the belated, June 16, 2016 complaints that Mr. Sampson had rummaged through the desks of two coworkers broke any causal connection between his participated in protected activity and his termination.  Kane is again wrong on both points.

---

[79](...continued)
faith by Kane, the conditions of Mr. Sampson's employment at Kane had become so intolerable that a reasonable person could not and would not accept the new position and continue working for Kane.

74.  Kane either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated that a reasonable employer would have realized that a reasonable person in the employee's position would be compelled to not continue working at Kane in the new position.

75.  As a consequence, Mr. Sampson did not accept the new position and did not return to work for Kane.

Complaint ¶¶ 72-75[Doc. # 2 at 20-21 and 16-17].  In addition, throughout his Complaint, Mr. Sampson alleges that Kane terminated him from his position. Complaint ¶¶ 20, 45, 73, 79, and 81 [Doc. # 2 at 21-22 and 6, 11, 16, 17, and 18]. Then, in Counts III and V, Mr. Sampson alleges that Kane subjected him to an unlawful "retaliatory termination," in violation of Title VII and Section 1981. Complaint ¶¶ 96-101 and 109-14 [Doc. # 2 at 21-22 and 24-25].  Thus, though Mr. Sampson does not use the adjective "constructive" when describing his termination, it is beyond obvious that his Complaint states proper claims alleging just that.

A.   **The Question Whether Mr. Sampson Was Subjected to a Constructive Termination Presents Genuine Issues of Material Fact.**

To establish that he or she was constructively discharged, an employee must prove that the employer's illegal retaliatory act has made working conditions so intolerable that a reasonable person in the employee's position would feel compelled to resign.[80]   A finding of constructive discharge should not be based solely on the retaliatory act at issue; there must also be aggravating factors that make staying on the job intolerable.[81]   A perceived demotion or reassignment to a job with lower status or lower pay may, depending upon the individual facts of the case, constitute aggravating factors that would justify finding of constructive discharge.[82]   A "reassignment is not a demotion unless the employee can show that he receives less pay, has less responsibility, or is required to utilize a lesser degree of skill than his previous assignment."[83]   Thus, a reassignment would constitute a demotion if the

---

[80]  *E.g., Spulak v. K Mart Corp.*, 894 F.2d 1150, 1154 (10th Cir. 1990) (citation omitted).

[81]  *Cockrell v. Boise Cascade Corp.*, 781 F.2d 173, 177 (10th Cir. 1986).

[82]  *Id.* at 177-78.

[83]  *Hooks v. Diamond Crystal Specialty Foods, Inc.*, 997 F.2d 793, 799 (10th Cir. 1993) (emphasis added).

employee will be paid less in the new position.[84]  In the end, whether a plaintiff can support a claim for constructive discharge in the case of a reassignment is a quintessential jury question.[85]

In light of these principles, Kane cannot legitimately contend that the facts would not permit a jury to reasonably conclude that Mr. Sampson was constructively discharged.  Indeed, when Kane suspended him as a disciplinary action, Kane also eliminated his position as Lead LTO as part of that disciplinary action (though there are in fact conflicting stories on whether the elimination of his position was part of the disciplinary action or merely the result of an astoundingly coincidental lack of need for the position).  And, as part of that elimination of his position, Kane stripped Mr. Sampson of his supervisory responsibilities and reduced his pay.  In this situation, the question whether Mr. Sampson was terminated is plainly, quintessentially, a question of fact for the jury.[86]

---

[84] *E.g., James v. Sears, Roebuck & Co.*, 21 F.3d 989, 992-993 (10th Cir. 1994).

[85] *E.g., McInerney v. United Airlines, Inc.*, 463 Fed. Appx. 709, 716-17 (10th Cir. 2011) (stating that the question whether an employee resigned or was terminated is ultimately a question of fact for the jury).

[86] *See, e.g., McInerney*, 463 Fed. Appx. at 716-17; *James*, 21 F.3d at 992-993; *Spulak*, 894 F.2d at 1154.

-34-

**B.    The Question Whether a Causal Connection Existed Between Mr. Sampson's Participation in Protected Activity and His Termination Presents Genuine Issues of Material Fact.**

As Kane appears to recognize (Motion at 36), "[f]or purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action."[87]   Yet, "a plaintiff may rely on temporal proximity alone only if the termination is very closely connected in time to the protected activity."[88]   On the other hand, the Tenth Circuit has also made clear that the "close temporal proximity" upon which a plaintiff may rely to support a retaliation claim "must not be read too restrictively where the pattern of retaliatory conduct begins ... soon after the filing of [a] complaint and only culminates later in actual discharge."[89]

---

[87]   *Fye*, 516 F.3d at 1228.

[88]   *Metzler*, 464 F.3d at 1171 (internal quotations omitted, emphasis in original).

[89]   *Marx v. Schnuck Mkts., Inc.,* 76 F.3d 324, 329 (10th Cir.1996) (addressing retaliation claim asserted under the Fair Labor Standards Act ("FLSA")), *cert. denied*, 518 U.S. 1019 (1996); *see also Piercy v. Maketa,* 480 F.3d 1192, 1198-99 (10th Cir. 2007) (noting that a pattern of conduct and other evidence may establish that an adverse employment action was taken, even after a lengthy period of time, in response to earlier, protected activity that is temporally remote).

-35-

With these principles in mind, it is clear that a jury could reasonably conclude that the requisite causal connection exists here.  Mr. Sampson received a Succession Plan for his advancement during October 2015 and then a favorable Performance Evaluation for the period ended December 31, 2015.  Then, beginning in 2016, he started to make frequent complaints to Kane that he was being subjected to a racially hostile work environment and discriminatory treatment.  Next, though he had received that year-end Performance Evaluation on March 28, 2016, he received an ACR later the same day that was not mentioned during his performance review even though the event cited in the ACR had occurred on March 23, 2016.  Mr. Sampson then notified Kane on or about June 8, 2016 that he had started the administrative process by filing a claim with the UALD; and then followed up with a June 11, 2016 email to Ms. Cooper in which he notified her that he had done so.  On June 16, 2016, Kane obtained written statements from two employees concerning allegations that he had rummaged through desks of his coworkers not in June 2016 but back in April and May 2016.  Mr. Sampson then notified Mr. Maxwell during the morning of June 28, 2016 that he had submitted his Charge of Discrimination to the UALD.  The same day, June 28, 2016 in the afternoon, Mr. Sampson received his second ACR.  Then,

on June 30, 2016, Kane suspended Mr. Sampson without pay, eliminated his position, and reduced his pay.

In these circumstances, given the pattern of conduct by Kane against Mr. Sampson in response to his participation in protected activity together with temporal proximity between his participation in protected activity with the ultimate adverse action taken against him, a jury could easily, reasonably conclude that the requisite causal connection exists.[90]

Against all this, Kane asserts (id. at 35-37) that the belated, June 16, 2016 complaints that Mr. Sampson had rummaged through the desks of two coworkers broke any causal connection between his participated in protected activity and his

---

[90] *E.g., Gardner*, 2016 U.S. Dist. LEXIS 37963, *53-54 (concluding that the requisite causal connection based on the proximity of time between plaintiff employee's protected opposition and adverse employment actions; where, within one month after plaintiff employee voiced his opposition to defendant employer's treatment and termination of his spouse, defendant informed plaintiff of its intent to transfer him to another division, placed him on paid administrative leave, informed him that he could not return to work until his issues and his wife's issues were resolved, and then terminated him when he withdrew his agreement to a negotiated settlement); *see also Marx,* 76 F.3d at 329 (reversing summary judgment in favor of employer on a FLSA retaliation clam when employee presented evidence of a pattern of actions taken by the employer following the employee's protected activity) (citing *Jackson v. RKO Bottlers of Toledo, Inc.,* 743 F.2d 370, 377 n. 4 (6th Cir.1984) (reversing judgment for defendant and remanding for further consideration of Title VII retaliation claim where discharge occurred nearly one and one-half years after complaint but pattern of retaliation allegedly began soon after complaint was filed)).

-37-

termination.  Yet, for purposes of summary judgment and drawing all reasonable inferences in favor of Mr. Sampson as we are required to do, it is clear that a jury could reasonably conclude that Kane solicited the statements from employees for events that had long passed and would not have terminated Mr. Sampson based on those events but for his having participated in protected activity.  In the end, as we make clear below, a jury could reasonably conclude that the use of those past alleged incidents was merely a pretext for terminating Mr. Sampson from his position at Lead LTO.

## II.  A JURY COULD REASONABLY CONCLUDE THAT THE EVER-CHANGING REASONS PROFFERED BY KANE FOR MR. SAMPSON'S TERMINATION ARE MERELY PRETEXTUAL.

Mr. Sampson concedes, as he must in light of the minimal burden imposed on Kane, that the Defendant has met its burden of articulating a non-retaliatory reason for his termination.  Accordingly, the burden shifts back to Mr. Sampson to show that there exists a dispute of material fact as to whether that proffered reason is merely pretextual.[91]  In the context of a motion for summary judgment, "[o]nce a defendant

---

[91] *E.g., Antonio v. Sygma Network, Inc.,* 458 F.3d 1177, 1181 (10th Cir. 2006). To establish pretext, Mr. Sampson is not required to prove the ultimate issue whether Kane acted with a retaliatory intent. *Randle*, 69 F.3d at 455.  Retaliatory animus may be inferred from a simple showing of pretext. *Id.*  As a result, Mr. Sampson can defeat the Kane's motion for summary judgment solely by establishing a prima facie (continued...)

articulates a legitimate non-retaliatory reason, 'the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief.'"[92]

A plaintiff can satisfy this burden by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence.'"[93]   In the context of a motion for summary judgment, a "plaintiff need not prove that discrimination or retaliation was the [employer's] actual motivation[.]"[94]   "So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-[retaliatory] reason

---

[91](...continued)
case and showing pretext.  *Id.*

[92] *Butler v. City of Prairie Village, Kansas,* 172 F.3d 736, 749 (10th Cir. 1999) (reversing the grant of summary judgment to the defendants on plaintiff's claim under the Americans with Disabilities Act) (citations omitted); *see also Reeves*, 530 U.S. at 144-49.

[93] *Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000); *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250-51 (10th Cir. 2002) (so stating); *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997).

[94] *Wright*, 547 Fed. Appx. at 863.

is unworthy of belief) upon which a jury could infer [retaliatory] motive, the case should go to trial."[95]

"Evidence sufficient to raise a genuine question whether an employer's proffered explanation is pretextual may 'take a variety of forms.'"[96]  For example, evidence of pretext may include but is not limited to facts tending to show that the proffered reason is false, procedural irregularities, the use of subjective criteria, or actions contrary to written or written company policies or practices.[97]

The proper assessment at the summary judgment stage is whether all of the evidence of pretext creates an issue of fact on the matter of pretext.[98]  Accordingly, when assessing whether the plaintiff has made an appropriate showing of pretext, the trial court must consider the evidence as a whole.[99]  "[A] plaintiff's prima facie case, plus evidence that the defendant's reasons for the adverse actions were pretextual,

---

[95] *Randle*, 69 F.3d at 453.

[96] *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1198 (10th Cir. 2000) (citation omitted); *see also Doebele v. Sprint / United Mgt. Co.*, 342 F.3d 1117, 1135-36 (10th Cir. 2003).

[97] *See, e.g., Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[98] *Doebele*, 342 F.3d at 1137.

[99] *E.g., Danville*, 292 F.3d at 1250 (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).

may be adequate to defeat a motion for summary judgment."[100]  Thus, "… the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly draw therefrom … on the issue of whether the defendant's explanation is pretextual.'"[101]  The Tenth Circuit has made clear that, "at the summary judgment stage, 'all doubts concerning pretext must be resolved in plaintiff's favor.'"[102]

Here, the very close temporal proximity between Mr. Sampson's participation in protected activity that we address above supports the conclusion that the reason proffered by Kane for his termination was merely pretextual.  "[T]emporal proximity is one relevant factor to be considered by the courts in determining whether the employer's explanation is a pretext for retaliation[.]"[103]  Yet, "even 'very close' temporal proximity" alone cannot "operate as a proxy for the evidentiary requirement" sufficient for a plaintiff to demonstrate pretext.[104]  "To raise a fact issue

---

[100]  *Doebele*, 342 F.3d at 1135-36.

[101]  *Reeves*, 530 U.S. at 143 (citations omitted); *see also Randle*, 69 F.3d at 452.

[102]  *Doebele*, 342 F.3d at 1139 (quoting *Morgan*, 108 F.3d at 1324).

[103]  *Metzler*, 464 F.3d at 1172.

[104]  *Id*. (internal quotations omitted).

of pretext, [a plaintiff] must ... present evidence of temporal proximity plus circumstantial evidence of retaliatory motive." *Id*. (internal quotations omitted).

And the record here reflects more than sufficient additional evidence. Indeed, as we note above in addressing the clear causal connection between Mr. Sampson's participation in protected activity and his termination, Kane obtained statements from two employees during June 2016 in which two employees claimed that, well before the statements were made, he rummaged through the desks of coworkers. From that fact alone, a jury could reasonably conclude that the reason proffered by Kane for Mr. Sampson's termination was merely pretextual.

But here there is substantially more. For example, the record shows that Kane instituted a break policy that prevented Mr. Sampson from communicating with Human Resources while on his break – supporting the conclusion that Kane wanted to impede, at least during working hours, Mr. Sampson's efforts to raise his complaints of discrimination and retaliation. In addition, Ms. Chacon testified during her deposition not that she simply submitted her statement but that Mr. Yslas solicited the statement from her in June 2016 about the alleged desk rummaging incident in which she was involved back in April 2016. That sequence renders the use of the alleged incident as a reason for Mr. Sampson's termination suspect at best. Further,

-42-

Mr. Sampson was given a Succession Plan for his advancement and received a favorable Performance Review and praise for his performance, until he started raising serious complaints about discriminatory and retaliatory treatment in earnest.  Then, shortly after he complained, Mr. Sampson was given his first ACR (which may or may not be a disciplinary action) the day after he was given that performance review for an event that occurred before he was given the review – though no mention of the complaint about his work had been made at the review.

As Mr. Sampson's complaints intensified, Kane's retaliation against him intensified.  Almost immediately after he made it known to Kane that he had filed an administrative claim with the UALD and on the same day that he provided that notice, he was given another ACR.  Then, shortly after that, Kane came up with the two June 2016 statements from employees for alleged conduct that had occurred well prior to the statements.  The question is not whether the incidents occurred (a fact that is disputed).  Rather, the obvious question for a jury to resolve is why, given that the incidents were brought to the attention of Kane's management well in advance of June 2016, Kane took now action against Mr. Sampson concerning the alleged conduct until after he had filed his Intake Questionnaire and then his Charge with the UALD.  Finally, based on the information provided in those statements, Kane

-43-

eliminated his position and reduced his pay.  And Kane offered one, then two, then three reasons for eliminating his position – a disciplinary action, the position was not needed, and Mr. Sampson was not qualified.

In the end, in light of all of this, a jury could reasonably conclude that the reason proffered by Kane for its termination of Mr. Sampson's employment – the incidents identified in the post hoc, June 2016 statements – was merely pretextual.[105]

## CONCLUSION

The Court should deny Kane's Motion for Summary Judgment as to Mr. Sampson's claims in Counts II and V alleging that he was subjected to a retaliatory termination in violation, respectively, of Title VII and Section 1981.  The Court should dismiss the remaining Counts.

---

[105] *E.g., Lints v. Graco Fluid Handling (A) Inc.*, Case No. 2:15-cv-00655-DN, 2018 U.S. Dist. LEXIS 177799, *20-21 (D. Utah Oct. 15, 2018) (Nuffer, J.) (concluding that the plaintiff employee had established that the defendant employer's explanation for plaintiff's termination based on attendance was pretextual, based on evidence that established that he was terminated one day after he submitted his complaint of sexual harassment to the defendant's management and that he had obtained approval from his supervisor for his absences).

Respectfully submitted this 27th day of November 2018:

/s/ Gregory W. Stevens
Gregory W. Stevens
*Attorney for Plaintiff*
*Aaron L. Sampson*

## CERTIFICATE OF COMPLIANCE

In accordance with DUCivR 7-1(a)(3), I hereby certify that this document complies with the word-count limit specified in that Rule.  It is printed in 14-point Times New Roman type, a proportionally spaced font, and contains 9,998 words, excluding the face sheet, Table of Contents, Table of Authorities, signature block, this Certificate of Compliance, and the Certificate of Service.  I relied on Corel WordPerfect X7, the wordprocessor used to create this document, to determine this count.

*/s/ Gregory W. Stevens*
Gregory W.  Stevens

## CERTIFICATE OF SERVICE

I hereby certify that, this 27th day of November 2018, I served a copy of the foregoing Memorandum, together with the Exhibits cited in the Memorandum, via the ECF system, on the following counsel:

Kathleen Weron, Esquire
Trevor J. Lee, Esquire
Manning Curtis Bradshaw & Bednar, PLLC

*/s/ Gregory W. Stevens*
Gregory W. Stevens