# **EXHIBIT B**
Transcript of the Deposition of Don Maxwell

**Page 1**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

--------------------------------------------------

AARON L. SAMPSON,            )
                             ) Case No. 2:17-cv-00947-DN
    Plaintiff,               )
                             )
 vs.                         ) Deposition of:
                             )
KANE IS ABLE, INC.,          ) DON MAXWELL
                             )
    Defendant.               ) Judge David Nuffer
_____)

September 6, 2018 - 8:40 a.m.

Location: 2825 East Cottonwood Parkway

Suite 500

Salt Lake City, Utah 84121

Reporter: Marsha Beuchert, CSR, RPR

Notary Public in and for the State of Utah

**Page 2**

```
 1              A P P E A R A N C E S
 2   For the Plaintiff:
             Gregory W. Stevens
 3           ATTORNEY AT LAW
             2825 East Cottonwood Parkway
 4           Suite 500
             Salt Lake City, Utah 84121
 5           E-mail: utlaw@aol.com
             Tel: 801.990.3388
 6
     For the Defendant:
 7           Trevor J. Lee
             MANNING, CURTIS, BRADSHAW & BEDNAR
 8           136 E. South Temple
             Suite 1300
 9           Salt Lake City, Utah 84111
             E-mail: tlee@mc2b.com
10           Tel: 801.363.5678
11   Also Present:
             Aaron Sampson
12
13                    I N D E X
14   DON MAXWELL                               PAGE
15     Examination by Mr. Stevens            3, 23
16     Examination by Mr. Lee               21, 24
17
```

**Page 3**

```
 1                P R O C E E D I N G S
 2
 3                DON MAXWELL,
 4   called as a witness, having been duly sworn,
 5       was examined and testified as follows:
 6
 7                   EXAMINATION
 8   BY MR. STEVENS:
 9       Q.  Please state your name.
10       A.  Don Maxwell.
11       Q.  Where do you work?
12       A.  Kane Is Able, Salt Lake.
13       Q.  How long have you been employed there?
14       A.  Three and a half years.
15       Q.  What positions have you held during that
16   period?
17       A.  Just the quality manager.
18       Q.  What do you do as quality manager?
19       A.  It's basically operations manager.  I run
20   the day-to-day operation down on the floor.
21       Q.  Was Floyd -- is Floyd Kearl your
22   supervisor?
23       A.  Yes.
24       Q.  Has he been your supervisor during the
25   entire time you've been employed by Kane?
```

**Page 4**

```
 1       A.  Yes.
 2       Q.  Did you, while he was employed there, know
 3   somebody by the name of Aaron Sampson?
 4       A.  Yes.
 5       Q.  What position did he hold when he started
 6   working at Kane?
 7       A.  He was the outbound lead, shipping lead.
 8       Q.  What were the duties of his position?
 9       A.  His duties were to distribute the work to
10   the pickers, the drivers, to make sure everything
11   went out in a quality manner.
12       Q.  What's a picker?
13       A.  A picker is someone who picks the product
14   for the customers, gets it ready for the trucks that
15   go out.
16       Q.  Would you take a look under Tab 1 at what's
17   been marked as Exhibit 1?
18       A.  Yes.
19       Q.  Do you know what that is?
20       A.  This looks like his offer letter.
21       Q.  Prior to today, had you seen a copy of that
22   letter?
23       A.  No.
24       Q.  Did you have any role in hiring
25   Mr. Sampson?
```



Page 5

1     A.   Yes.
2     Q.   What was your role?
3     A.   Me and Floyd made the decision who we hire,
4  who we don't.
5     Q.   Was Mr. Sampson terminated from his
6  position?
7     A.   I guess in the end he was.  I think it was
8  job abandonment.
9     Q.   Did you have any role in making the
10 decision to terminate Mr. Sampson?
11    A.   No.
12    Q.   I'll have you take a look under Tab 2 at
13 what's been marked as Exhibit 2.  Can you tell me
14 what that is?
15    A.   Looks like the LTO lead job description.
16    Q.   Does what's reflected on Exhibit 2
17 accurately describe the LTO job?
18    A.   Yes.
19    Q.   Is that the position that Mr. Sampson
20 occupied while he was employed by Kane?
21    A.   Yes.
22    Q.   Did he have any supervisory authority over
23 other employees at Kane?
24    A.   The supervisory authority would be
25 direction and assistance.

Page 6

1     Q.   What do you mean by "direction and
2  assistance"?
3     A.   Showing them best methods for picking.  He
4  also would be in communication with the carriers, and
5  making sure the product goes out in a quality manner.
6     Q.   While he was employed by Kane, did
7  Mr. Sampson perform the duties of his position well?
8     A.   He needed a lot of training.  We knew that
9  bringing him in, so we tried to help him train up.
10    Q.   After he was trained, did he perform the
11 duties of his position well?
12    A.   No, he did not.
13    Q.   Was that during the entire time that he
14 worked for Kane that he didn't perform the duties of
15 his position well?
16    A.   Well, after a while we saw that he wasn't
17 quite catching on, so we were working to coach him
18 up.
19    Q.   When did you make the determination that he
20 wasn't catching on?
21    A.   Well, you know, any job requires coaching,
22 and we were just trying to coach him up.  As far as
23 the time frame, you know, it could have been after a
24 couple of months.
25    Q.   Would you take a look under tab 3 at what's

Page 7

1  been marked as Exhibit No. 3?
2     A.   Uh-huh (affirmative).
3     Q.   Is that also -- is that the same job
4  description that's reflected in Exhibit 2 for the
5  lead LTO position that Mr. Sampson had?
6     A.   It covers the basic things.  They both
7  cover the basic things.
8     Q.   Is there anything left out of Exhibit 3
9  that Mr. Sampson was required to do as part of his
10 job responsibilities?
11         MR. LEE:  Objection, foundation.
12         THE WITNESS:  What was the question again?
13    Q.   BY MR. STEVENS:  Is there anything left out
14 of Exhibit 3 that Mr. Sampson was required to perform
15 as part of his job responsibilities?
16         MR. LEE:  Same objection.
17         THE WITNESS:  Not that I notice.
18    Q.   BY MR. STEVENS:  Would you take a look
19 under tab 4 at Exhibit No. 4?  Tell me what that is.
20    A.   This is associate counseling.
21    Q.   What's the purpose of an associate
22 counseling?
23    A.   The purpose of associate counseling is to
24 help coach up people so they understand their job
25 responsibilities.

Page 8

1     Q.   Did you sign this document on the second
2  page?
3     A.   Yes.  On the first page?
4     Q.   On the first page.
5     A.   Yeah.
6     Q.   Whose signature is that that appears under
7  Mr. Sampson's signature on the second page?
8     A.   That's Floyd's.
9     Q.   So your signature is on the first page?
10    A.   Yeah.
11    Q.   Is that "yes"?
12    A.   Yes.
13    Q.   It's just for the court reporter that we
14 want to make sure the record is clear what you're
15 actually saying.
16    A.   Oh, okay.  Yes.
17    Q.   And on here you put "type of counseling
18 given, verbal"; is that correct?
19    A.   Yeah.
20    Q.   Are all verbal counselings reflected in a
21 written associate counseling report?
22    A.   No, this is -- we have verbal counseling,
23 and then it goes to written warning, then final
24 suspension, stuff like that.
25    Q.   So the question was were all verbal



Page 9

```
 1  counselings reflected in a written document in an
 2  associate counseling report like this one?
 3       A.   Yes.
 4       Q.   So this one was for poor performance; is
 5  that correct?
 6       A.   Yes.
 7       Q.   What was it Mr. Sampson did or didn't do
 8  that reflected poor performance?
 9       A.   I think basically it says that he didn't --
10  wasn't quite fulfilling the requirements of the job,
11  and so we thought we'd take an opportunity to help
12  coach him up.
13       Q.   What was it that he didn't do that was a
14  requirement of the job?
15       A.   Looks like he failed to put a pallet on a
16  truck, and we stated here that we wanted to counsel
17  him just to ensure that pallets aren't missed in the
18  future.
19       Q.   Would you take a look under tab 5 at
20  Exhibit 5?  Is that another associate counseling
21  report that reflected a verbal counseling given to
22  Mr. Sampson?
23       A.   Yes.
24       Q.   And is that your signature that appears on
25  the first page?
```

Page 10

```
 1       A.   Yes.
 2       Q.   This one has a check next to it, poor
 3  performance and poor work quality; is that right?
 4       A.   Correct.
 5       Q.   What was it that Mr. Sampson did or didn't
 6  do that you believe reflected poor performance and
 7  poor work quality?
 8       A.   Looks like he made a receiving error as
 9  well as not responding to the customer in a timely
10  manner, which caused them to do some follow-up.  So
11  we wanted to help him with that as well.
12       Q.   What's a receiving error?
13       A.   Well, a receiving error is when we bring
14  product into the building, and it's just not right
15  when we brought it in.  If you receive something
16  wrong, it causes all sorts of problems downstream.
17  So it's very important to make sure we're receiving
18  stuff correctly.
19       Q.   So what error are you saying in this
20  Exhibit 5 that Mr. Sampson did that was a receiving
21  error?
22       A.   In this case it looks like he put an
23  incorrect lot in for an item.
24       Q.   Under "Manager's statement" -- the heading
25  "Manager's statement" where it refers to something
```

Page 11

```
 1  that happened on June 24, 2016?
 2       A.   I think it --
 3       Q.   The second paragraph.
 4       A.   Oh, the second.  I'm sorry.
 5       Q.   What is that referring to?
 6       A.   We received a request from the customer to
 7  get something received in quick, which happens quite
 8  a bit.  And they gave me a call later in the day
 9  asking me why it wasn't received.
10       Q.   How frequently would a receiving error
11  occur at your facility?
12       A.   We get one every once in a while.
13       Q.   While Mr. Sampson was employed by Kane, are
14  you aware of any other employees who received an
15  associate counseling report for having made a
16  receiving error?
17       A.   Gosh, I'd have to check.
18       Q.   So sitting here today, you can't say one
19  way or the other?
20       A.   I am not sure on receiving.  I know that
21  I've given several shipping error counselings and
22  correctives.  Receiving?  There may have been a
23  couple.  I'd really have to check.
24       Q.   Would you take a look under tab 6 of
25  Exhibit No. 6?  Have you seen a copy of that document
```

Page 12

```
 1  prior to today?
 2       A.   No.
 3       Q.   Take a minute and read through the
 4  document, and tell me whether you were made aware by
 5  anyone of the allegations made in the document.
 6       A.   Okay.
 7       Q.   Were you made aware of any of the
 8  allegations that are reflected in Exhibit No. 6?
 9       A.   Seems like I heard about some of them.  I
10  guess I -- some.
11       Q.   Okay.  Which one?
12       A.   I knew that he was suspended for going
13  through mine and Diane's desk.  Basically that's it,
14  I guess.
15       Q.   How did you -- did you personally see
16  Mr. Sampson going through yours and Diane's desk?
17       A.   No.
18       Q.   How did you learn that Mr. Sampson went
19  through yours and Diane's desk?
20       A.   It was reported to me after I got back from
21  vacation.  I was on vacation during the time.
22       Q.   Who reported it to you?
23       A.   I think I heard it from Natalia.
24       Q.   What is Natalia's last name?
25       A.   Oh, gosh.  She moved to Florida a couple of
```



                                                                 13
1   years ago.  Scholl or something like that.  Schull.
2       Q.   Will you take a look under tab 7 at Exhibit
3   No. 7 and tell me what that is?
4       A.   Oh, this is his yearly review.  The first
5   one.
6       Q.   Mr. Sampson's yearly review?
7       A.   Yes.
8       Q.   Who evaluated Mr. Sampson that's reflected
9   on Exhibit 7?
10      A.   I did.
11      Q.   So the review date is March 27, 2016; is
12  that correct?
13      A.   That's when we gave it, I think.
14      Q.   What period did it cover?
15      A.   It covered up to the end of 2015.
16      Q.   Take a look at what's been marked as
17  Exhibit 8.  Tell me what that is.
18      A.   This is his 45-day review.
19      Q.   Was he working for Kane through a temporary
20  agency, ProLogistics?
21      A.   Let's see.  Yes.  Yes.
22      Q.   So this was a review done by Kane for the
23  work he performed for Kane while he was working
24  through ProLogistics; is that correct?
25      A.   Correct.

                                                                 14
1       Q.   Did Kane, while Mr. Sampson was employed
2   through ProLogistics, set the duties of his position?
3       A.   Did Kane set --
4       Q.   Yes.
5       A.   Yes.
6       Q.   Do you know what ProLogistics did while he
7   was employed through ProLogistics?
8       A.   Nothing.  ProLogistics just provides us
9   with the help, and then we take it from there as far
10  as their attendance and training.
11      Q.   So you -- that is "you", meaning Kane, sets
12  their compensation and duties and work requirements;
13  is that correct?
14      A.   Correct.
15      Q.   Take a look at Exhibit 9 and tell me what
16  that is.
17      A.   Oh, this is a succession plan that Floyd
18  offers.
19      Q.   Do you know the purpose of the succession
20  plan?
21      A.   It's something that is optional, and the
22  employee asks to be part of it.
23      Q.   Do you know why a succession plan is put in
24  place?
25      A.   Yeah.  What we do is we want to evaluate

                                                                 15
1   where they're at and what they want, and then we take
2   the sections of it and help coach them up.
3       Q.   After Mr. Sampson worked for the temp
4   agency, I take it Kane hired him as a permanent
5   employee; is that fair?
6       A.   Correct.
7       Q.   Would you take a look at what's been marked
8   as Exhibit 12?  Can you tell me what that is?
9       A.   This is our break and lunch schedule.
10      Q.   Was this break and lunch schedule in place
11  while Mr. Sampson was employed by Kane?
12      A.   I think it came in -- it was during.  It
13  wasn't the whole time.  Yes.
14      Q.   Do you know when it was put in place?
15      A.   Gosh.  No.
16      Q.   Do you remember the year?
17      A.   No, I don't.  I'd have to check on that.
18      Q.   Did you have any input in establishing this
19  break and lunch schedule?
20      A.   No.  This came down from HR, I'm pretty
21  sure.
22      Q.   Do you know if Mr. Sampson was ever told
23  that he couldn't contact Kane's human resources
24  department during his breaks or lunch?
25      A.   No.  That's the preferred time.

                                                                 16
1       Q.   Do you know if, while sitting at his desk,
2   whether he was ever prohibited from contacting human
3   resources?
4       A.   No.
5       Q.   "No", he wasn't, or "no", you don't know?
6       A.   No, he wasn't, as far as I know.
7       Q.   I didn't ask the question very well.
8            Was Mr. Sampson at some point suspended
9   from his position as lead forklift operator?
10      A.   Yes.
11      Q.   Do you know why?
12      A.   I think it had something to do with the
13  going through my desk and Diane's desk.
14      Q.   Did you have any input into the decision to
15  suspend him?
16      A.   No.
17      Q.   Did you have any discussions with Floyd
18  Kearl about Mr. Sampson going through your desk or
19  through -- was it Diane's desk?
20      A.   No, the -- I got back from vacation and I
21  heard about it.  By then I think Floyd and HR had
22  that pretty well underway.  I mean, obviously I knew
23  about it.  They told me when I got back.
24      Q.   Do you know whether Mr. -- when Mr. Sampson
25  was suspended whether it was with or without pay?



**17**

1   A.   With.
2   Q.   Did Kane at some point eliminate the
3   position of LTO?
4   A.   Yeah.  Yes.  For about a year until we got
5   enough people.
6   Q.   So I take it the decision to eliminate the
7   LTO position wasn't a disciplinary action against
8   Mr. Sampson; is that correct?
9        MR. LEE:  Object to foundation.
10       THE WITNESS:  No.
11  Q.   BY MR. STEVENS:  Did you have any input
12  into the decision to eliminate the LTO position?
13  A.   No.  I think it was just based had off
14  number of people.
15  Q.   Take a look back at Exhibits 4 and 5, the
16  associate counseling reports.  Were the issues raised
17  in Exhibits 4 and 5 brought to Mr. Sampson's
18  attention when he was given the performance review
19  that is reflected in Exhibit 7?
20  A.   No.
21  Q.   Why not?
22  A.   Because they're totally separate issues and
23  timelines.
24  Q.   What do you mean?
25  A.   Well, the review, that ended December of

**18**

1   2015, and these occurred afterwards.
2   Q.   They did occur, though, before you actually
3   gave Mr. Sampson his performance review, correct?
4   A.   Let's see the date here.  I gave this on
5   3/27, and, yes, one of them did occur before the --
6   before I gave the review.
7   Q.   Take a look at what's been marked as
8   Exhibit 14.  Have you seen a copy of that e-mail
9   prior to today?
10  A.   Looks like it was sent to me, but I can't
11  remember -- obviously I've seen it, yes.
12  Q.   Do you know if the subject of what's talked
13  about in the e-mail that's reflected in Exhibit 14 is
14  one of the issues raised in one of the associate
15  counseling reports?
16  A.   Let's take a look here.  What was the
17  question again?
18  Q.   Is the subject of what's being talked about
19  in Exhibit 14 one of the issues raised in either one
20  of the associate counseling reports that he received?
21  A.   No.
22  Q.   Did anybody from Kane's human resources
23  department ever talk to you about a claim by
24  Mr. Sampson that he believed he was being treated
25  differently because of his race?

**19**

1   A.   Pretty sure, yes, sometime, because I was
2   aware.
3   Q.   Do you know whether it was before or after
4   Mr. Sampson was terminated?
5   A.   Before.  It had to have been before.  I
6   know that Aaron told us first.  He told me and Floyd,
7   and then we went to HR.  I am sure it was discussed.
8   Q.   Do you know the person with whom you spoke
9   at HR about Mr. Sampson's claim?
10  A.   Had to have been Ann or Alfonso.  They're
11  the ones that was working with Aaron.
12  Q.   Were you present when Mr. Sampson was
13  suspended from his position?
14  A.   No.  I wasn't in the room.
15  Q.   Do you know whether security was present
16  when he was being suspended?  While he was told he
17  was being suspended?
18  A.   Present, like in the facility or in the
19  room?
20  Q.   With him in the room.
21  A.   I don't think so, no.  But I don't
22  remember.  I wasn't involved.
23  Q.   Take a look at Exhibit 16.  Have you seen a
24  copy of that document before today?
25  A.   I don't think I saw this one.

**20**

1   Q.   You were talking about Mr. Sampson's
2   performance.  What problems in his performance did
3   you believe he had?
4   A.   Basically it was not fulfilling the job
5   responsibilities fully.
6   Q.   What were the responsibilities that he
7   didn't fulfill?
8   A.   There was a couple of things.  Error
9   research, direction.
10  Q.   What do you mean by "direction"?
11  A.   Just a few things he needed coached up on.
12  Q.   What do you mean by "direction"?
13  A.   Basically what picks needed to be done
14  first and in what order.
15  Q.   Other than the written verbal -- other than
16  the written verbal counselings that are reflected in
17  Exhibits 4 and 5, did you maintain or keep any notes
18  of having counseled Mr. Sampson?
19  A.   Yes.  I mean, I noted that he was given
20  counselings on certain days.
21  Q.   Where would those notes be maintained?
22  A.   They're on my laptop.
23  Q.   Your personal laptop or business laptop?
24  A.   The business.
25  Q.   How do you -- in what sort of program did



                                                                21
 1   you use to write them down?
 2      A.   Just Word.  Just date and Word.
 3           MR. STEVENS:  I don't know if you've asked
 4   for those or produced those, but if you haven't --
 5           MR. LEE:  I'll check.
 6           MR. STEVENS:  -- if you could provide
 7   those.  Let's take a break.
 8           (Recess.)
 9      Q.   BY MR. STEVENS:  Back on the record.
10           So you were referring to a time when you
11   were on vacation.  Do you know when that was?  When
12   you were out of the office on vacation?
13      A.   Oh, gosh.  No.
14      Q.   Okay.
15      A.   I mean, I take a vacation every once in a
16   while.  I am sure it was to Maryland.  I have kids
17   that live there.
18           MR. STEVENS:  I have no further questions.
19
20                    EXAMINATION
21   BY MR. LEE:
22      Q.   Don, I just have a couple of questions for
23   you here.
24           Mr. Stevens asked you about verbal
25   counselings.  What do you understand "verbal

                                                                22
 1   counseling" to mean?
 2      A.   Verbal counseling, I guess the actual form
 3   would be -- I guess it's more official.
 4      Q.   You mean the -- you're referring to the
 5   form, I think it was Exhibit 4 or 5, that says
 6   "counseling" at the top with the box "verbal"
 7   checked.  Is that what you mean?
 8      A.   Yes.
 9      Q.   Were there instances where you counseled or
10   coached people and didn't write it down?
11      A.   Yes.
12      Q.   Were there instances where you counseled or
13   coached or disciplined Mr. Sampson and didn't write
14   it down?
15      A.   Oh, I am sure there was, yes.
16      Q.   What about other employees at Kane?  Were
17   there instances where you disciplined or counseled or
18   coached or spoke with them about an incident or their
19   performance without writing that down?
20      A.   Yes.
21      Q.   How frequently did that occur?
22      A.   Well, it was during the start-up period.
23   Oh, gosh, two or three times a week.  People make an
24   error; people make a mistake.  Stack something wrong;
25   load something wrong.  We're always telling them,

                                                                23
 1   Hey, this isn't the right way.  Let's do it this way.
 2   Just the basic floor-type counselings or corrections,
 3   I guess.
 4      Q.   So it was the more serious errors that --
 5   let me rephrase that.
 6           What would result in actually creating --
 7   it's kind of weird to call it a verbal counseling
 8   because it's in writing.  You know what I am talking
 9   about?  The verbal counselings in Exhibits 4 and 5,
10   what would result in someone actually getting one of
11   those?
12      A.   When we talk to them on the floor, and if
13   they don't quite understand or correct the behavior,
14   then we have to write it down.  So it's more of a
15   documented verbal I guess.
16           MR. LEE:  No further questions.
17
18                FURTHER EXAMINATION
19   BY MR. STEVENS:
20      Q.   Did you ever impose a disciplinary action
21   without having some sort of written record?
22      A.   No.  All disciplinaries are written and
23   signed.
24           MR. STEVENS:  No further questions.
25

                                                                24
 1                FURTHER EXAMINATION
 2   BY MR. LEE:
 3      Q.   What do you mean by "discipline" when you
 4   say that?
 5      A.   Discipline is if -- whatever is in the
 6   verbal -- verbal is kind of like a first step.  If
 7   you don't correct your behavior, then we go to a
 8   written counseling, then a suspension, a final, just
 9   trying to coach them up.
10      Q.   So by "discipline," do you mean -- what do
11   you interpret "discipline" to mean when Mr. Stevens
12   says you would never discipline someone without
13   writing it down?  Is that like a termination or
14   something?  What do you mean "discipline" to mean
15   there?
16      A.   Actually discipline would be like a final
17   step that leads towards termination.  Other than
18   that, all these check marks in 4 and 5, these are
19   all -- the verbal, the written, these are all
20   coaching tools.  I wouldn't call them disciplinary.
21   As a matter of fact -- for instance, when I write
22   somebody up for attendance and I give them -- start
23   with the verbal for attendance, it's a benefit to
24   them because I am telling them where they're at, and
25   telling them they're starting to step outside the



## 25

```
 1  bounds so they can correct themselves.  But as far as
 2  discipline, that would be way down the road with
 3  suspension, termination, I guess.
 4          MR. LEE:  No further questions.
 5          MR. STEVENS:  Do you want him to read and
 6  sign?
 7          MR. LEE:  Sign the transcript?
 8          MR. STEVENS:  Yeah.  Do you want a reading
 9  copy?  It's up to you.
10          MR. LEE:  I think we can just -- have we
11  been --
12          MR. STEVENS:  He got a reading copy.  I
13  don't think we made any corrections to it.
14          MR. LEE:  Yeah, we would take that just to
15  look through it.  Yeah.
16          THE COURT REPORTER:  Copy for you?
17          MR. LEE:  Yes, electronic.
18          (Deposition concluded at 9:46 a.m.)
```

## 26

```
 1              WITNESS CERTIFICATE
 2          I, DON MAXWELL, HEREBY DECLARE:
 3          That I am the witness in the foregoing
    transcript; that I have read the transcript and know
 4  the contents thereof; that with these corrections I
    have noted this transcript truly and accurately
 5  reflects my testimony.
 6  PAGE-LINE         CHANGE/CORRECTION        REASON
    ---------     ----------------------    ----------
 7  ---------     ----------------------    ----------
    ---------     ----------------------    ----------
    ---------     ----------------------    ----------
 8  ---------     ----------------------    ----------
    ---------     ----------------------    ----------
 9  ---------     ----------------------    ----------
    ---------     ----------------------    ----------
10  ---------     ----------------------    ----------
    ---------     ----------------------    ----------
11  ---------     ----------------------    ----------
    ---------     ----------------------    ----------
12  ---------     ----------------------    ----------
    ---------     ----------------------    ----------
13  ---------     ----------------------    ----------
    ---------        No corrections were made.
14
        I, DON MAXWELL, HEREBY DECLARE UNDER THE
15  PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES
    OF AMERICA AND THE LAWS OF THE STATE OF UTAH THAT THE
16  FOREGOING IS TRUE AND CORRECT.
17
                    _____
18                       DON MAXWELL
19
20      SUBSCRIBED and SWORN to at _____
21  _____, this_____day of_____,
22  2018.
23
                    _____
24                      Notary Public
25
```

## 27

```
 1              REPORTER'S CERTIFICATE
 2  STATE OF UTAH        )
                         ) ss.
 3  COUNTY OF SALT LAKE  )
 4          I, Marsha Beuchert, Registered
 5  Professional Reporter and Notary Public in and for
 6  the State of Utah, do hereby certify:
 7          THAT the foregoing proceedings were
 8  taken before me at the time and place set forth in
 9  the caption hereof; that the witness was placed under
10  oath to tell the truth, the whole truth, and nothing
11  but the truth; that the proceedings were taken down
12  by me in shorthand and thereafter my notes were
13  transcribed through computer-aided transcription; and
14  the foregoing transcript constitutes a full, true,
15  and accurate record of such testimony adduced and
16  oral proceedings had, and of the whole thereof.
17          I have subscribed my name on this
18  11th day of September, 2018.
19
20             Marsha Beuchert
               _____
21              MARSHA BEUCHERT, RPR
```



**1**

1  4:16,17
12  15:8
14  18:8,13,19
16  19:23

**2**

2  5:12,13,16 7:4
2015  13:15 18:1
2016  11:1 13:11
24  11:1
27  13:11

**3**

3  6:25 7:1,8,14
3/27  18:5

**4**

4  7:19 17:15,17 20:17 22:5 23:9 24:18
45-day  13:18

**5**

5  9:19,20 10:20 17:15,17 20:17 22:5 23:9 24:18

**6**

6  11:24,25 12:8

**7**

7  13:2,3,9 17:19

**8**

8  13:17

**9**

9  14:15
9:46  25:18

**A**

a.m.  25:18
Aaron  4:3 19:6,11
abandonment  5:8
accurately  5:17
action  17:7 23:20
actual  22:2
affirmative  7:2
agency  13:20 15:4
Alfonso  19:10
allegations  12:5,8
Ann  19:10
appears  8:6 9:24
asks  14:22
assistance  5:25 6:2
associate  7:20,21,23 8:21 9:2,20 11:15 17:16 18:14,20
attendance  14:10 24:22,23
attention  17:18
authority  5:22,24
aware  11:14 12:4,7 19:2

**B**

back  12:20 16:20,23 17:15 21:9
based  17:13
basic  7:6,7 23:2
basically  3:19 9:9 12:13 20:4,13
behavior  23:13 24:7
believed  18:24
benefit  24:23
bit  11:8
bounds  25:1
box  22:6
break  15:9,10,19 21:7
breaks  15:24
bring  10:13
bringing  6:9
brought  10:15 17:17
building  10:14
business  20:23,24

**C**

call  11:8 23:7 24:20
called  3:4
carriers  6:4
case  10:22
catching  6:17,20
caused  10:10
check  10:2 11:17,23 15:17 21:5 24:18
checked  22:7
claim  18:23 19:9
clear  8:14
coach  6:17,22 7:24 9:12 15:2 24:9
coached  20:11 22:10,13,18
coaching  6:21 24:20
communication  6:4
compensation  14:12
concluded  25:18
contact  15:23
contacting  16:2
copy  4:21 11:25 18:8 19:24 25:9,12,16
correct  8:18 9:5 10:4 13:12,24,25 14:13,14 15:6 17:8 18:3 23:13 24:7 25:1
corrections  23:2 25:13
correctives  11:22
correctly  10:18
counsel  9:16
counseled  20:18 22:9,12,17
counseling  7:20,22,23 8:17,21,22 9:2,20,21 11:15 17:16 18:15,20 22:1,2,6 23:7 24:8
counselings  8:20 9:1 11:21 20:16,20 21:25 23:2,9
couple  6:24 11:23 12:25 20:8 21:22
court  8:13 25:16
cover  7:7 13:14
covered  13:15
covers  7:6
creating  23:6
customer  10:9 11:6
customers  4:14

**D**

date  13:11 18:4 21:2
day  11:8
day-to-day  3:20
days  20:20
December  17:25
decision  5:3,10 16:14 17:6,12
department  15:24 18:23
deposition  25:18
describe  5:17
description  5:15 7:4
desk  12:13,16,19 16:1,13,18,19
determination  6:19
Diane's  12:13,16,19 16:13,19
differently  18:25
direction  5:25 6:1 20:9,10,12
disciplinaries  23:22
disciplinary  17:7 23:20 24:20
discipline  24:3,5,10,11,12,14,16 25:2
disciplined  22:13,17
discussed  19:7
discussions  16:17
distribute  4:9
document  8:1 9:1 11:25 12:4,5 19:24
documented  23:15
Don  3:3,10 21:22
downstream  10:16
drivers  4:10
duly  3:4
duties  4:8,9 6:7,11,14 14:2,12

**E**

e-mail  18:8,13
electronic  25:17
eliminate  17:2,6,12
employed  3:13,25 4:2 5:20 6:6 11:13 14:1,7 15:11
employee  14:22 15:5
employees  5:23 11:14 22:16
end  5:7 13:15
ended  17:25
ensure  9:17
entire  3:25 6:13
error  10:8,12,13,19,21 11:10,16,21 20:8 22:24
errors  23:4
establishing  15:18
evaluate  14:25
evaluated  13:8
EXAMINATION  3:7 21:20 23:18 24:1
examined  3:5
Exhibit  4:17 5:13,16 7:1,4,8,14,19 9:20 10:20 11:25 12:8 13:2,9,17 14:15 15:8 17:19 18:8,13,19 19:23 22:5
Exhibits  17:15,17 20:17 23:9

**F**

facility  11:11 19:18



fact 24:21
failed 9:15
fair 15:5
final 8:23 24:8,16
floor 3:20 23:12
floor-type 23:2
Florida 12:25
Floyd 3:21 5:3 14:17 16:17, 21 19:6
Floyd's 8:8
follow-up 10:10
forklift 16:9
form 22:2,5
foundation 7:11 17:9
frame 6:23
frequently 11:10 22:21
fulfill 20:7
fulfilling 9:10 20:4
fully 20:5
future 9:18

**G**

gave 11:8 13:13 18:3,4,6
give 24:22
gosh 11:17 12:25 15:15 21:13 22:23
guess 5:7 12:10,14 22:2,3 23:3,15 25:3

**H**

half 3:14
happened 11:1
heading 10:24
heard 12:9,23 16:21
held 3:15
Hey 23:1
hire 5:3
hired 15:4
hiring 4:24
hold 4:5
HR 15:20 16:21 19:7,9
human 15:23 16:2 18:22

**I**

important 10:17
impose 23:20
incident 22:18
incorrect 10:23
input 15:18 16:14 17:11

instance 24:21
instances 22:9,12,17
interpret 24:11
involved 19:22
issues 17:16,22 18:14,19
item 10:23

**J**

job 5:8,15,17 6:21 7:3,10, 15,24 9:10,14 20:4
June 11:1

**K**

Kane 3:12,25 4:6 5:20,23 6:6,14 11:13 13:19,22,23 14:1,3,11 15:4,11 17:2 22:16
Kane's 15:23 18:22
Kearl 3:21 16:18
kids 21:16
kind 23:7 24:6
knew 6:8 12:12 16:22

**L**

Lake 3:12
laptop 20:22,23
lead 4:7 5:15 7:5 16:9
leads 24:17
learn 12:18
LEE 7:11,16 17:9 21:5,21 23:16 24:2 25:4,7,10,14,17
left 7:8,13
letter 4:20,22
live 21:17
load 22:25
long 3:13
lot 6:8 10:23
LTO 5:15,17 7:5 17:3,7,12
lunch 15:9,10,19,24

**M**

made 5:3 10:8 11:15 12:4,5, 7 25:13
maintain 20:17
maintained 20:21
make 4:10 6:19 8:14 10:17 22:23,24
making 5:9 6:5
manager 3:17,18,19
Manager's 10:24,25

manner 4:11 6:5 10:10
March 13:11
marked 4:17 5:13 7:1 13:16 15:7 18:7
marks 24:18
Maryland 21:16
matter 24:21
Maxwell 3:3,10
meaning 14:11
methods 6:3
mine 12:13
minute 12:3
missed 9:17
mistake 22:24
months 6:24
moved 12:25

**N**

Natalia 12:23
Natalia's 12:24
needed 6:8 20:11,13
noted 20:19
notes 20:17,21
notice 7:17
number 17:14

**O**

Object 17:9
objection 7:11,16
occupied 5:20
occur 11:11 18:2,5 22:21
occurred 18:1
offer 4:20
offers 14:18
office 21:12
official 22:3
operation 3:20
operations 3:19
operator 16:9
opportunity 9:11
optional 14:21
order 20:14
outbound 4:7

**P**

pallet 9:15
pallets 9:17
paragraph 11:3
part 7:9,15 14:22

pay 16:25
people 7:24 17:5,14 22:10, 23,24
perform 6:7,10,14 7:14
performance 9:4,8 10:3,6 17:18 18:3 20:2 22:19
performed 13:23
period 3:16 13:14 22:22
permanent 15:4
person 19:8
personal 20:23
personally 12:15
picker 4:12,13
pickers 4:10
picking 6:3
picks 4:13 20:13
place 14:24 15:10,14
plan 14:17,20,23
point 16:8 17:2
poor 9:4,8 10:2,3,6,7
position 4:5,8 5:6,19 6:7, 11,15 7:5 14:2 16:9 17:3,7, 12 19:13
positions 3:15
preferred 15:25
present 19:12,15,18
pretty 15:20 16:22 19:1
prior 4:21 12:1 18:9
problems 10:16 20:2
produced 21:4
product 4:13 6:5 10:14
program 20:25
prohibited 16:2
Prologistics 13:20,24 14:2, 6,7,8
provide 21:6
purpose 7:21,23 14:19
put 8:17 9:15 10:22 14:23 15:14

**Q**

quality 3:17,18 4:11 6:5 10:3,7
question 7:12 8:25 16:7 18:17
questions 21:18,22 23:16, 24 25:4
quick 11:7

**R**

race 18:25
raised 17:16 18:14,19



**read** 12:3 25:5
**reading** 25:8,12
**ready** 4:14
**receive** 10:15
**received** 11:6,7,9,14 18:20
**receiving** 10:8,12,13,17,20
  11:10,16,20,22
**Recess** 21:8
**record** 8:14 21:9 23:21
**referring** 11:5 21:10 22:4
**refers** 10:25
**reflected** 5:16 7:4 8:20 9:1,
  8,21 10:6 12:8 13:8 17:19
  18:13 20:16
**remember** 15:16 18:11
  19:22
**rephrase** 23:5
**report** 8:21 9:2,21 11:15
**reported** 12:20,22
**reporter** 8:13 25:16
**reports** 17:16 18:15,20
**request** 11:6
**required** 7:9,14
**requirement** 9:14
**requirements** 9:10 14:12
**requires** 6:21
**research** 20:9
**resources** 15:23 16:3
  18:22
**responding** 10:9
**responsibilities** 7:10,15,
  25 20:5,6
**result** 23:6,10
**review** 13:4,6,11,18,22
  17:18,25 18:3,6
**road** 25:2
**role** 4:24 5:2,9
**room** 19:14,19,20
**run** 3:19

**S**

**Salt** 3:12
**Sampson** 4:3,25 5:5,10,19
  6:7 7:5,9,14 9:7,22 10:5,20
  11:13 12:16,18 13:8 14:1
  15:3,11,22 16:8,18,24 17:8
  18:3,24 19:4,12 20:18 22:13
**Sampson's** 8:7 13:6 17:17
  19:9 20:1
**schedule** 15:9,10,19
**Scholl** 13:1
**Schull** 13:1
**sections** 15:2

**security** 19:15
**separate** 17:22
**set** 14:2,3
**sets** 14:11
**shipping** 4:7 11:21
**Showing** 6:3
**sign** 8:1 25:6,7
**signature** 8:6,7,9 9:24
**signed** 23:23
**sitting** 11:18 16:1
**sort** 20:25 23:21
**sorts** 10:16
**spoke** 19:8 22:18
**Stack** 22:24
**start** 24:22
**start-up** 22:22
**started** 4:5
**starting** 24:25
**state** 3:9
**stated** 9:16
**statement** 10:24,25
**step** 24:6,17,25
**Stevens** 3:8 7:13,18 17:11
  21:3,6,9,18,24 23:19,24
  24:11 25:5,8,12
**stuff** 8:24 10:18
**subject** 18:12,18
**succession** 14:17,19,23
**supervisor** 3:22,24
**supervisory** 5:22,24
**suspend** 16:15
**suspended** 12:12 16:8,25
  19:13,16,17
**suspension** 8:24 24:8 25:3
**sworn** 3:4

**T**

**tab** 4:16 5:12 6:25 7:19 9:19
  11:24 13:2
**talk** 18:23 23:12
**talked** 18:12,18
**talking** 20:1 23:8
**telling** 22:25 24:24,25
**temp** 15:3
**temporary** 13:19
**terminate** 5:10
**terminated** 5:5 19:4
**termination** 24:13,17 25:3
**testified** 3:5
**things** 7:6,7 20:8,11
**thought** 9:11

**time** 3:25 6:13,23 12:21
  15:13,25 21:10
**timelines** 17:23
**timely** 10:9
**times** 22:23
**today** 4:21 11:18 12:1 18:9
  19:24
**told** 15:22 16:23 19:6,16
**tools** 24:20
**top** 22:6
**totally** 17:22
**train** 6:9
**trained** 6:10
**training** 6:8 14:10
**transcript** 25:7
**treated** 18:24
**truck** 9:16
**trucks** 4:14
**type** 8:17

**U**

**Uh-huh** 7:2
**understand** 7:24 21:25
  23:13
**underway** 16:22

**V**

**vacation** 12:21 16:20
  21:11,12,15
**verbal** 8:18,20,22,25 9:21
  20:15,16 21:24,25 22:2,6
  23:7,9,15 24:6,19,23

**W**

**wanted** 9:16 10:11
**warning** 8:23
**week** 22:23
**weird** 23:7
**Word** 21:2
**work** 3:11 4:9 10:3,7 13:23
  14:12
**worked** 6:14 15:3
**working** 4:6 6:17 13:19,23
  19:11
**write** 21:1 22:10,13 23:14
  24:21
**writing** 22:19 23:8 24:13
**written** 8:21,23 9:1 20:15,
  16 23:21,22 24:8,19
**wrong** 10:16 22:24,25

**Y**

**year** 15:16 17:4
**yearly** 13:4,6
**years** 3:14 13:1

